## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.*, ANHAM FZCO AND ASADULLAH SADERKHAIL )))) | |
| Plaintiff-Relators, ) | CASE NO.: 1:17-cv-1290 (TSE/JFA) |
| ) | |
| BRINGING THIS ACTION ON BEHALF OF ) THE UNITED STATES OF AMERICA ) | **DO NOT PLACE ON PACER** **DO NOT SERVE DEFENDANTS** **DO NOT PLACE IN PRESS BOX** |
| ) | |
| c/o ) UNITED STATES ATTORNEY ) EASTERN DISTRICT OF VIRGINIA ) | |
| ) | **AMENDED COMPLAINT AND** |
| and ) | **JURY DEMAND** |
| ) | |
| JEFFERSON B. SESSIONS ) ATTORNEY GENERAL OF THE ) UNITED STATES ) | |
| ) | AMENDED COMPLAINT |
| ) | FILED **UNDER SEAL** |
| vs. ) | PURSUANT TO |
| ) | 31 U.S.C. § 3730(b)(2) |
| SUPREME FOODSERVICE, GMBH ) | |
| ) | |
| SUPREME GROUP USA LLC ) | |
| ) | **JURY TRIAL DEMANDED** |
| SADER AL KHAIL GENERAL TRADING, LLC ) | |
| ) | |
| STEPHEN ORENSTEIN ) | |
| ) | |
| SOREN BORUP NORGAARD ) | |
| ) | |
| HAJI OBAIDULLAH SADER KHAIL ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

# INTRODUCTION

1.  Plaintiff-Relators ANHAM FZCO ("ANHAM") and ASADULLAH SADERKHAIL bring this *qui tam* action in the name of the United States of America and themselves to recover damages and civil penalties arising from the actions of Defendants Supreme Foodservice GmbH ("Supreme"); Supreme Group USA LLC; Sader Al Khail General Trading, LLC; Stephen Orenstein; Soren Borup Norgaard; Haji Obaidullah Sader Khail; their respective corporate officers; related companies; and related individuals in conspiring to perpetrate a fraudulent scheme by which Supreme and the other named defendants intentionally delayed implementation of a subsistence prime vendor contract competitively awarded to the relator ANHAM (the "ANHAM SPV Contract").

2.  The Subsistence Prime Vendor ("SPV") Afghanistan program involves the Government selection of the prime contractor responsible for providing subsistence food products to the United States military and other federally-funded customers in Afghanistan.

3.  Supreme was the incumbent contractor who had been performing these services since 2005, first under its own SPV contract, and later under non-competitive, sole-source bridge contracts. The intended purpose and result of Defendants' fraud scheme was to induce the Government to continue payments to Supreme under its SPV bridge contracts, at prices exceeding competitive market prices by at least 44%, after the point in time when the Government would have terminated the bridge contracts absent the fraud. The Supreme SPV bridge contracts were set to be terminated by the Government once ANHAM commenced deliveries under the ANHAM SPV Contract.

4.  Delay in ANHAM's commencement of deliveries under its SPV Contract was caused by Defendants' fraudulent and unlawful seizure of ANHAM's Kandahar warehouse facilities.

Through seizure of the warehouse, Defendants knowingly and intentionally delayed ANHAM's ability to commence distribution to the geographical regions of Afghanistan that were supposed to receive supplies from the Kandahar warehouse. This delay in ANHAM's contract performance, which was directly attributable to Supreme's seizure of ANHAM's Kandahar warehouse, together with other wrongful conduct by Defendants, prevented the Government from terminating Supreme's SPV bridge contract and commencing orders under the competitively awarded ANHAM SPV Contract.

5. Supreme knew that this seizure of ANHAM's Kandahar facilities would cause the Government to be overcharged by Supreme until ANHAM could replace its Kandahar warehouse and distribution facilities.

6. This fraudulent delay resulted in Supreme knowingly charging the Government rates that were at least 44% higher than the rates dictated by ANHAM's SPV Contract, and Supreme knew that by causing the delay, it would, and in fact did, fraudulently bill the government hundreds of millions of dollars. This fraudulent billing resulted in the government paying Supreme hundreds of millions of dollars it would not have otherwise paid.

7. The highest-level representatives of Supreme knowingly and intentionally conspired with others, known and unknown, including but not limited to Afghan business interests and Afghan government officials, via payments and other benefits constituting bribes, to strip ANHAM of its access to and ownership of both the Kandahar warehouse and the land on which the warehouse was situated.

8. Defendants knew and intended that their wrongful and illegal actions, and their conspiracy with others, would result in the United States Government being overcharged, and that

those overcharges ultimately amounted to not less than $933 million dollars, and upon information and belief, substantially more.

9.    Defendants' actions also were intended to cause and did cause substantial monetary damages to ANHAM, including but not limited to profits ANHAM would have derived from the $1.21 billion or more in lost revenue, which is estimated to be $182 million, attributable to the fraudulent conduct identified in this Amended Complaint. In addition, thereto ANHAM was further damaged in the proximate amount of $20 million, this sum representing the cost of procuring the Kandahar warehouse prior to its unlawful seizure.

## THE PARTIES INVOLVED

10.   Plaintiff-Relator ANHAM is a global logistics services company and supply chain contractor formed under the laws of Dubai and the United Arab Emirates. Its principal place of business is located at Dubai Airport Free Zone East Wing, Building 4A, Suite No. 608, Dubai, United Arab Emirates. ANHAM USA, Inc. is a management services company in the United States, which provides certain contractual services to ANHAM and is located at 1600 Tysons Boulevard, 6th Floor, McLean, VA 22102.

11.   Plaintiff-Relator Asadullah Saderkhail is an Afghan citizen and currently resides in the United Arab Emirates. Relator Saderkhail was employed by Sader Al Khail General Trading LLC ("SAK") from May 2011 until May 2015. He served as General Manager of SAK's office in the United Arab Emirates. SAK's owner, Haji Obaidullah Sader Khail, issued Mr. Saderkhail a power of attorney for carrying out SAK's business dealings. Relator Saderkhail's responsibilities included, *inter alia*, overseeing SAK's warehouse and property dealings in Afghanistan and Dubai. He possesses first-hand knowledge of the factual assertions contained herein.

12.     Defendant Supreme Foodservice GmbH is a privately-held company formed under the laws of Switzerland. Supreme's Middle East operations are headquartered in Dubai, United Arab Emirates at Level 8, Le Solarium Building. At all times relevant herein, the company also had offices in Switzerland, the Netherlands and the United States. Supreme's address in Switzerland is c/o Umberg Treuhand AG, Zwinglistrasse 6, 8750 Glarus. Supreme's office in the United States during the periods the periods referenced herein was located at 11911 Freedom Drive #1180, Reston, VA 20190.

13.     Sader Al Khail General Trading LLC (aka, SAK Group FZCO, or "SAK") is a privately held company formed under the laws of the United Arab Emirates. SAK operates as a logistics company that specializes in commodities transportation. The company's addresses are listed as: Sheikh Mohammed Bin Zayed Road (E311 Road), Dubai, United Arab Emirates, and Office 718 – Le Solarium Building Dubai Silicon Oasis, Dubai, United Arab Emirates.

14.     Government Official A, whose significance is described further below, is an undisclosed secret partner of SAK who held a 50% ownership interest in SAK. SAK maintains a secret and confidential off-the-books accounting system wherein the main ledger report prepared in or about 2013 states that of the SAK financial assets on hand, $28,855,269.50 USD belonged to Government Official A.

15.     As part of the conspiracy to delay the implementation of the ANHAM SPV contract, defendant SAK acted as Supreme's agent, fixer, and front company in the "purchasing," seizing, and subsequently "leasing" of the Kandahar warehouse facilities. Because of this concerted activity Supreme exercised dominion and control, and directly or indirectly possessed the Kandahar warehouse facilities and land. The Kandahar warehouse was never

returned to, or in the control or possession of, ANHAM after being seized by a militia paid for directly or indirectly by Supreme.

16.     Stephen Orenstein was the Chief Executive Officer of Supreme and is a German citizen. He played an integral role in the seizure of ANHAM's Kandahar warehouse by orchestrating and approving the entire scheme to defraud the Government.

17.     Soren Borup Norgaard is an attorney and corporate officer for Supreme and is a Danish citizen. Norgaard played an integral role in the seizure of ANHAM's Kandahar warehouse by both coordinating the financial transactions responsible for allowing Supreme to assume control of ANHAM's Kandahar warehouse and the underlying parcel of land and by orchestrating the unlawful interference with ANHAM's interest therein.

18.     Haji Obaidullah Sader Khail ("Sader Khail") is the chief executive and principal owner of SAK. During the events detailed in this Amended Complaint, Sader Khail was the Chairman of the Afghan Business Counsel (in Dubai) and Honorable Consul of Afghanistan to Cyprus. Sader Khail is a citizen of Cyprus.

## JURISDICTION AND VENUE

19.     This action arises under the Federal False Claims Act, 31 U.S.C. § 3729, *et seq.*

20.     Subject matter jurisdiction over all stated causes of action brought pursuant to the False Claims Act is conferred upon this Court by 28 U.S.C. § 1331, in that this action arises under the laws of the United States, and by 31 U.S.C. § 3732, which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730. Jurisdiction over all state law claims is conferred by supplemental and pendent jurisdiction.

21.     Venue is proper in the United States District Court for the Eastern District of Virginia pursuant to 28 U.S.C. § 1391(c) and 31 U.S.C. § 3732(a) as the Court has personal

jurisdiction over at least one Defendant who can be found in, resides, transacts business, or has performed acts proscribed by 31 U.S.C. § 3729 in this district. Each Defendant also caused false claims to be made or certified in this jurisdiction and has contacts with the United States sufficient to confer jurisdiction under the False Claims Act.

22. Pursuant to the requirements of 31 U.S.C. § 3730(b), Plaintiff-Relators voluntarily provided the federal government with a pre-filing written disclosure containing substantially all the information in support of the allegations made herein.

23. There has been no public disclosure of the allegations contained herein. To the extent jurisdictionally required, Plaintiff-Relators are original sources of the information contained in this Amended Complaint within the meaning of 31 U.S.C. § 3730(e)(4); they have direct and independent knowledge of the information contained herein; and they have voluntarily provided such information to the United States Government.

24. Plaintiff-Relators have complied with all conditions precedent to bringing this action.

## FACTUAL ALLEGATIONS

25. Defendant Supreme served as a prime vendor for U.S. interests in Afghanistan beginning in June 2005 under contract SPM300-05-D-3130, which ran through December 12, 2010. On November 10, 2010, Supreme's contract was extended through December 12, 2012, pursuant to a non-competitive bridge contract ("the First Bridge Contract") in order that the Defense Logistics Agency, Troop Support ("DLA") would have time to solicit bids and award a new competitive contract and to give the new contractor time to prepare to commence deliveries before DLA's purchases from Supreme were terminated.

26. On April 26, 2011, DLA issued Solicitation No. SPM300-11-R-0063, contemplating the award of a single indefinite-delivery/indefinite-quantity, fixed-price contract for the supply

and delivery of food items to the U.S. military throughout various sites in Afghanistan. This Solicitation was intended to replace the prime vendor contract then in place with Supreme.

27.    The solicitation closed on July 13, 2011, and DLA received complete proposals from four offerors, with Supreme's and ANHAM's proposals constituting the two best offers. The new contract was awarded to ANHAM on June 22, 2012 and called for deliveries by ANHAM to commence on December 22, 2012 after a six month "ramp up" period.

28.    To compete for and ultimately win the SPV contract, ANHAM had to design and build two massive warehouses in Afghanistan through which the storage, processing, and delivery of foodstuffs to the U.S. military troops, NATO troops, and associated identified parties, would occur—one primary warehouse in Bagram, Afghanistan to serve the northern portions of the Country, and another in Kandahar, Afghanistan to serve the southern portions of the Country.

29.    In June 2011, to obtain a location for the Kandahar warehouse, ANHAM's agent Afghan Fleet and Group Services, Inc. ("AFGS") entered into an Agreement and Bill of Sale with Afghan Meco Logistics Services ("MECO") and its partners whereby ANHAM acquired a 50% ownership interest and the right to build a warehouse on 48 Jeribs of land located in Kandahar province. Per the terms of the Agreement and Bill of Sale, ANHAM was to retain a 50% ownership stake in the full tract of land but the constructed warehouse and other improvements would all sit on portions of the tract owned 100% by ANHAM.

30.    ANHAM proceeded immediately to build on this property the second largest warehouse in the country (exceeded in size only by its Bagram warehouse), as well as living and working space for up to 500 workers at a cost of approximately $20 million USD.

31.    ANHAM's investment in construction of the warehouse allowed ANHAM to win the competitively awarded SPV contract on June 22, 2012, approximately a year after purchase of the Kandahar property.

32.    On June 19, 2012, a few days before the new contract was awarded to ANHAM, DLA extended Supreme's sole-source bridge contract from December 13, 2012 through December 12, 2013 (the "Second Bridge Contract") to provide time for adjudication of bid protests and other potential delays in the commencement of deliveries under the new contract.

33.    The Second Bridge Contract was sole-source and terminable-at-will. The Justification and Approval ("J&A") DLA prepared justifying the sole source award states that "should a competitively awarded contract be put into place ahead of the projected timeline, [Supreme's] contract extension will be terminated...." The J&A also noted that the extension was being issued because DLA anticipated that a bid protest would delay the final award of the competitively awarded SPV contract.

34.    In addition to the J&A, the lawful ability to terminate the Second Bridge Contract was derived from the Federal Acquisition Regulations ("FAR") standard termination clause found at 48 C.F.R. §§ 52.249-2 & 52.249-6 ("[T]he Government may terminate performance of work under [the bridge] contract in whole or, from time to time, in part if the Contracting Officer determines that a termination is in the Government's interest").

35.    On June 22, 2012, DLA awarded Contract No. SPM300-12-D-3571 to ANHAM for a projected sixty-six (66)-month duration with a potential value greater than $8 billion. DLA determined that Supreme's bid was the second-best offer, primarily because Supreme

proposed to charge the government rates that were 44% higher than the rates ANHAM would charge.

36. Supreme filed bid protests that resulted in the imposition of two "statutory stays" pursuant to 31 U.S.C. § 3553(d)(3), the first of these being filed July 5, 2012. The filing of this bid protest resulted in DLA issuing ANHAM a stop work order on July 5, 2012 that remained in place until December 7, 2012. A second "statutory stay" resulted in the issuance of a second stop work order that commenced on February 20, 2013 and ended on March 27, 2013.

37. DLA intended to terminate Supreme's Second Bridge Contract extension as soon as the bid protests ended and ANHAM could commence performance.

38. Given the complexity of the ANHAM SPV Contract and the logistics required to switch vendors, the contract included a six-month implementation phase, or "ramp-up" period, during which Supreme would remain the principal supplier under the Second Bridge Contract until ANHAM had in place the required stock of goods to succeed Supreme and became responsible for supplying all the relevant Department of Defense Activity Address Codes ("DODAACs") set forth in ANHAM's SPV Contract. The "ramp-up" period was set to end on December 22, 2012.

39. Upon information and belief, Supreme was also required under its SPV contract to provide a "ramp-down" schedule for this period and to assist in the transition.

40. The Government intended to and would have terminated Supreme's Second Bridge Contract as contemplated under the J&A and standard FAR termination clause as soon as ANHAM was able to commence performance.

41.    During the ramp-up period between June 22, 2012 and December 22, 2012 ANHAM's Kandahar and Bagram warehouse facilities were substantially completed such that ANHAM anticipated that it would be prepared to commence deliveries by December 22, 2012, the conclusion of the six-month ramp up period.

## Supreme's First Bid Protest

42.    However, on October 11, 2012 the GAO partially sustained Supreme's first bid protest and recommended that DLA reevaluate the Experience/Past Performance factor consistent with the solicitation evaluation criteria and determine whether that reevaluation altered the outcome of the award.

43.    DLA accepted GAO's October 11, 2012 determination and implemented the recommended reevaluation. The reevaluation period ran from that date until December 7, 2012, when DLA re-awarded the contract to ANHAM. The DLA determined that the re-awarding of the contract was justified because any existing technical capabilities Supreme had to offer were not worth the 44% price premium reflected in Supreme's bid proposal.

44.    Notably, the re-award took place on December 7, 2012, prior to the expiration of the original ramp-up period of December 22, 2012. The first bid protest and stop work order had been anticipated by DLA and was not expected to impact the schedule for commencement of deliveries under the ANHAM contract or termination of deliveries by Supreme.

45.    However, other actions taken by the co-conspirators during the reevaluation period, include the seizure of ANHAM's Kandahar warehouse facility by an armed security force on or about November 23, 2012.

## Fraudulent Conduct Occurring During the Bid Reevaluation Period

46.     Supreme and its co-conspirators utilized the reevaluation period to plan and execute several courses of fraudulent activity to derail and delay ANHAM's ability to commence performance of the Afghanistan SPV contract, including submission of a materially false and/or misleading October 26, 2012 letter to DLA ("October 26 Letter") and orchestrating the armed seizure of ANHAM's Kandahar warehouse on or about November 23, 2012.

47.     Supreme's October 26 Letter asked DLA to include in its reevaluation a reexamination of the responsibility determination DLA reached as to ANHAM's ability to perform the contract, a matter beyond the scope of the reevaluation ordered by the Court of Federal Claims.

48.     The October 26 Letter asserted that the agency's "responsibility" determination of ANHAM may no longer be valid based on "recent negative information regarding Anham and its ability to perform the SPV contract" because ANHAM was "constructing [its Bagram] warehouse on land it does not own and for which it does not have proper authorization to use for that purpose," such that "the Afgan [sic] government and local community leaders have sought to force Anham to demolish [its Bagram] warehouse." Supreme further asserted in a footnote that it was "not sufficiently familiar with the facts and Afgan [sic] law to verify that Anham has acted unlawfully as alleged. However, Supreme understands that a similar incident occurred in Kuwait when Anham improperly attempted to take control of public property, causing authorities to use bulldozers to destroy a security fence improperly constructed by Anham on public property."

49.     The October 26 Letter also alleged that several Afghan agencies were calling for the demolition of the Bagram warehouse. No valid documentation to support this allegation exists.

50.     In support of the allegations raised in the October 26 Letter Supreme obtained and attached an August 27, 2012 letter from the Afghanistan National Economy Committee ("NEC") that was addressed to "the Military contractors of USA" in general, rather than to ANHAM. The NEC is a committee within the lower house of Afghanistan's bicameral parliament and is not part of the country's executive branch of government.

51.     The October 26 Letter was an act in furtherance of a conspiracy by Supreme and its Defendant co-conspirators aimed at disqualifying ANHAM as a "responsible contractor" by interfering with its ability to construct necessary warehousing and thereby inducing continued orders under Supreme's Second Bridge Contract at prices 44% higher than those under the ANHAM SPV Contract.

52.     Upon information and belief, the October 26 Letter was the product of a political interference operation carried out at the direction of Supreme. That operation encompassed paying newspapers to write false articles, to finance and facilitate organized local protests, and to procure a letter from the NEC.

53.     The submission of the October 26 Letter necessarily resulted in a delay in the re-awarding of the Afghanistan SPV contract to ANHAM as the contracting officer was forced to convene multiple meetings with other contracting officers, with his supervisor and agency counsel, and with the director and deputy direct of the agency's subsistence directorate.

54.     The *unanimous* opinion of the contracting officer and everyone he consulted was that the allegations set forth in the October 26 Letter were not credible.

55.    The allegations found in the October 26 Letter are materially false and/or misleading. The falsity is demonstrated by Supreme's own admission that its basis for asserting that ANHAM did not have a right to use the land for warehousing purposes were based solely on "rumor and speculation."

56.    The allegations set forth in the October 26 Letter were materially false and/or misleading because Supreme falsely misrepresented that the fence in Kuwait was built on land ANHAM did not own when, in fact, ANHAM's warehouse subcontractor had obtained permission, in advance, to construct the fence on land owned by its subcontractor.

57.    The allegations set forth in the October 26 Letter were materially false and/or misleading because the NEC letter did not originate from the executive branch of government and was not addressed to ANHAM, whereas a contractor's compliance with Afghan law is instead properly addressed by the executive branch of the Afghanistan government and would have been sent directly to ANHAM, not addressed to U.S. contractors generally.

58.    The allegations set forth in the October 26 Letter were materially false and/or misleading because the DLA contracting officer inspected photographs of the Bagram facility and concluded that the construction was fully consistent with the lawful use of the land.

59.    The allegations set forth in the October 26 Letter were materially false and/or misleading because if ANHAM had wrongfully occupied the Bagram property and was building an unauthorized warehouse, the Afghanistan government would not have deployed 35 armed guards from the Afghanistan Public Protection Force to patrol and protect the construction site.

60.    The allegations set forth in the October 26 Letter were materially false and/or misleading because the lease of the land upon which the Bagram warehouse was being constructed

was executed by the Afghani Ministry of Agriculture, Irrigation and Livestock and that party never raised any objection to ANHAM's use of the land. To the contrary, the Ministry of Agriculture, Irrigation and Livestock expressly supported ANHAM's use of the Bagram property.

61. The allegations set forth in the October 26 Letter were materially false and/or misleading because the lease required that disputes had to be referred to an authorized Afghanistan court and no such legal proceeding was either threatened or imminent and never transpired.

62. Before DLA re-awarded the Afghanistan SPV contract to ANHAM on December 7, 2012 the contracting officer prepared a Memorandum for Record setting forth the contracting officer's conclusion that further inquiry into Supreme's October 26 Letter was not warranted because he was "not aware of any independent information substantiating the allegations raised by Supreme."

63. Supreme knew or should have known that the allegations it raised against ANHAM in its October 26 Letter were materially false and/or misleading and that submitting it to DLA would result in delay in the re-awarding of the contract to ANHAM.

64. Supreme submitted the October 26 Letter intending to prolong its bridge contract and/or to cause the government to initiate a responsibility investigation that would disqualify ANHAM and thereby cause the award of the Afghanistan SPV contract to Supreme as the second-best bidder.

65. Supreme knew that the delay resulting from its October 26 Letter would result in Supreme charging the government rates that were at least 44% higher than the government would have otherwise paid.

66.     Defendants Norgaard and Sader Khail sometimes met weekly in SAK's Dubai office to determine what could be done to interfere with ANHAM's business activities and how to take control of ANHAM's Kandahar Warehouse. These discussions commenced in or about the middle 2012.

67.     These meetings were held within earshot of Relator Saderkhail, when he was physically located in an office adjacent to where the weekly meetings were held. The meetings were held in a location where a half-height glass partition wall structure separated Relator Saderkhail's office from the location where the meetings were conducted. He readily overheard the meeting discussions. A repeated topic of conversation Relator Saderkhail overheard was directed at preventing ANHAM from initiating performance of its Afghanistan SPV contract. Those discussions eventually focused on how SAK and Supreme could take control of ANHAM's Kandahar Warehouse.

68.     During these meetings relator Saderkhail overheard Orenstein, Norgaard and Sader Khail agree that obtaining control over ANHAM's Kandahar warehouse was the course of action they would carry out to derail ANHAM's ability to commence performance of its SPV contract.

69.     Relator Saderkhail also overheard SAK and Supreme discuss utilizing Syed Sultanag to locate the owners of record of the Kandahar warehouse property.

70.     On November 10, 2012, Mohammad Anwar Abdulwahid ("Haji Anwar"), an Afghan citizen and owner of MECO, was fraudulently induced by agents of Supreme and SAK to breach the June 2011 Agreement and Bill of Sale by which MECO had sold the property on which the Kandahar warehouse was located to ANHAM/AFGS.

71. Haji Anwar was brought to Dubai to execute a Commercial Lease Agreement and Asset Purchase Agreement on behalf of MECO. The agreement was executed by Anwar and by defendant Sader Khail in the law offices of Charles Jackson. Also attending the signing was Government Official B, whose significance is described further below, as well as Supreme's attorney Charles Jackson, Norgaard, Sultanag, and Relator Saderkhail.

72. The consideration for MECO's breach of its obligations to ANHAM was initially provided on November 14, 2012, through a $20 million UBS bank guarantee issued against a Supreme account. The payment guarantee letter, Reference No. 30GA-E63981-7J1H, identified SAK as the debtor and MECO/Haji Anwar as the beneficiaries. The payment was valid through January 6, 2013. UBS banker Markus Krummenacher drafted the bank guarantee, writing:

> We have been informed that Afghan Meco Logistics Services and Mohammad Anwar Abdulwahid (collectively the "Sellers") have concluded on 10 November 2012 a contract (the "Asset Purchase Agreement") with Sader Al Khail General Trading LLC... (the "Buyer"), for certain assets, including a warehouse under construction, situated on a plot of land in Afghanistan. As per paragraph 5.3 of the Asset Purchase Agreement, the payment of the purchase price (the "Purchase Price") shall be secured, up to USD 20,000,000, by a bank guarantee in favour [*sic*] of the Sellers.

73. Supreme provided the $20 million bank guarantee and ultimately transferred nearly $16.8 million to SAK without entering into a written agreement with SAK. As late as 2015, approaching three years after the payment of funds, no written agreement between Supreme and SAK had been prepared or signed regarding the disposition of the Kandahar warehouse. Supreme's auditors ultimately caused the preparation of a written agreement to support the massive transfer of funds.

74. SAK and Supreme knew that ANHAM had constructed a multi-million-dollar warehouse complex in Kandahar on land rightfully belonging to ANHAM. SAK and Supreme further

knew that with MECO's approval they could deploy a private armed militia to take possession of the Kandahar warehouse facilities under threat of deadly force.

75. SAK and Supreme knowingly and tortuously induced MECO to breach its Agreement and Bill of Sale of June 2011 with ANHAM by executing a Commercial Lease Agreement and Asset Purchase Agreement dated November 10, 2012 with SAK. The fraudulent inducement included falsely alleging to MECO that the U.S. Government and the Afghan Government would not permit ANHAM to perform the SPV contract, and by falsely alleging that ANHAM would not be able to utilize MECO for any services under the SPV Contract.

76. Supreme, through its agent and co-conspirator SAK, offered to pay MECO an enormous amount of money -- $16.2 million -- in exchange for MECO breaching its agreement with ANHAM and transferring control of the Kandahar warehouse facility and underlying land to SAK for the benefit of Supreme. They also agreed to make future payments of $3 million annually to MECO during the first two years of possession.

77. On November 15, 2012, Supreme executive Norgaard e-mailed Sader Khail to obtain a third-party surveyor who could issue a report that would "set out the total amount of expenditure...required to complete the construction and fit out of the Assets for the Assets to be a fully operational US Department of Defense food warehouse and support facilit[y] compliant with VETCOM Standards."

78. On November 16, 2012, Norgaard sent an e-mail to Sader Khail containing specific language to be used to terminate various agreements, which Norgaard had admittedly never seen, between Meco, KGC and Mr. Anwar on one side and Anham and AFGS on the other side. Norgaard provided the following language, in relevant part:

Anham and AFGS have despite numerous written and verbal demands and warnings by us refused to pay for the services we have provided on the following agreements:

1. $4.4m for services provided under the National Afghan Trucking agreement
2. $x.xm for lease of land in Kandahar
3. $x.xm for security services for the land
4. $x.xm for security wall on the land
5. $x.xm for clearing the land
6. $$x.xm for foundation works
7. $x.xm for other works and services

The total amount owed to us is in excess of $15m and part of the amount has been owed to use for more than 15 months.

It is our position that Anham [sic] and AFGS are in breach of their obligations owed to Meco, KGC and Mr. Anwar under the above agreements and under law and that such breaches have not been remedied Anham [sic] and AFGS despite multiple demands. In that regard, Meco, KGC and Mr. Anwar hereby forthwith terminate the above agreements and any other agreement existing between us and Anham/AFGS/other companies affiliated with Anham of [sic] AFGS.

79. None of these allegations were true, and the wording was provided by Supreme as a pretext for interfering with ANHAM's pre-existing agreements and to seize ANHAM's substantial assets comprising the Kandahar warehouse.

80. Sader Khail forwarded the message to SAK's General Manager, Mohsan Ishtiaq, for implementation. On information and belief, MECO knew that the allegations were untrue and therefore never sent the recommended notice of termination to ANHAM.

81. In a November 21, 2012 e-mail, Supreme's Jan Langenbach informed Sader Khail and two other Afghan business associates that Supreme would be deploying a team to the Kandahar site to inventory the warehouse and assume control over security.

82. In a series of e-mails culminating on November 22, 2012, Defendants Sader Khail and Norgaard discussed a proposal from Hill International to perform a third-party survey and

cost completion analysis of the Kandahar warehouse site. Hill International's job proposal identified MECO and SAK as the "Seller" and "Buyer" of the warehouse site, respectively. The proposal included Hill's requirement that it be paid AED 110,000 as a mobilization fee.

83.    Ernie Pallett is Supreme's Director of Security – Corporate & Legal Affairs. On November 22, 2012, he e-mailed Syed Sultanag, a businessman who had dealings with SAK and MECO, a message stating:

> We are ideally aiming to have our staff at the site tomorrow and to provide security I will be deploying two vehicles with armed guards as additional support for our staff and another vehicle to extract them to our nearby site if needed…I believe Mr[.] Haji Obaidullah will also have his own security personnel on site…

84.    Syed Sultanag worked closely with certain corrupt, high-ranking Afghan officials to carry out the seizure of ANHAM's Kandahar warehouse. These high-ranking Afghan government officials are hereinafter referred to as "Government Official A" and "Government Official B." The identities of Government Official A and Government Official B are known to the Defendants and have been disclosed to the United States Government.

85.    Government Official A and Government Official B are known to have engaged in extrajudicial killings, forced disappearances and torture, such that their identities are omitted from this Amended Complaint to ensure the physical safety of ANHAM personnel located in or traveling to Afghanistan.

86.    Defendants' seizure of the Kandahar warehouse on or about November 23, 2012 was carried out with assistance obtained because of payoffs made to Government Officials A and B.

87.  Government Official A received a payoff of approximately $300,000 from Supreme for assisting with the armed security seizure of the Kandahar warehouse. Government Official A also obtained additional payoffs including a cash deposit of AED 367,000 ($100,000 U.S. cash equivalent). Relator Saderkhail was directed to deposit cash into a bank account held in the name of Government Official A. This cash payment was made at the express and direct instruction of Defendant Sader Khail. Other payoffs made to Government Official A include paying for family travel. Relator Saderkhail has personal knowledge that such payments include (i) SAK paying for a 4-bedroom apartment at the Galleria Residence, Hyatt Regency Dubai, for Government Official A and six members of his family in June 2012, which was billed to Defendant Sader Khail's personal MasterCard and Visa credit cards or paid for in cash; (ii) SAK providing airline tickets for six members of Government Official A's family to travel between the UK and the United States in or about December 2013; (iii) SAK paying AED 3,000 to cover Government Official A's UAE Dubai visa entry permit and to cover Government Official A's business class travel from Dulles International Airport to Dubai in January 2015.

88.  Government Official B likewise received payoffs for his assistance with the Kandahar warehouse seizure. These payoffs included placing Government Official B on the SAK company payroll at the rate of AED 7,000 (approximately $1,900 U.S.) per month during the Kandahar warehouse seizure.

89.  Upon information and belief, Government Official B received a payoff for witnessing the Asset Purchase Agreement and Commercial Lease between MECO and SAK on November 10, 2012. The particulars of such payoff are uniquely within the control of SAK.

90. On or about November 23, 2012 an armed militia captured the Kandahar warehouse by threat of deadly force. The sudden seizure of the warehouse occurred without ANHAM and AFGS having been provided with prior notice, explanation or justification. ANHAM's and AFGS's personnel were removed by force. Subsequent attempts to reenter the site met with the threat of deadly force and failed.

91. ANHAM did not understand what was transpiring regarding its warehouse until late December 2012, as it was receiving conflicting reports and was unable to obtain information from MECO or its owners.

92. On November 25, 2012, Supreme prepared an inventory on its own stationary of the seized contents of the Kandahar warehouse. Those contents were subsequently disposed of by SAK and Supreme.

93. On December 5, 2012 Supreme's Jan Langenbach e-mailed MECO's Haji Anwar and Defendant Sader Khail after the parties agreed to accept Hill International's proposal to conduct the third-party survey. Langenbach attached an engagement letter for Haji Anwar and Defendant Sader Khail to sign. The AED 110,000 mobilization fee was split evenly between Supreme and SAK, with each company paying AED 55,000.

94. In December 2012, Government Official A travelled to the United States and remained there for several months. During this time frame, Defendants Norgaard and Sader Khail visited with Government Official A. The particulars of their discussion are uniquely within the control of Defendants Supreme and Sader Khail. However, the purpose of this meeting was to retain Government Official A's continued assistance with Defendants' occupation of ANHAM's Kandahar warehouse.

## Supreme's False and Fraudulent Second Bid Protest

95. The re-awarding of the Afghanistan SPV contract to ANHAM on December 7, 2012 resulted in the filing of a second post-award protest by Supreme on December 17, 2012.

96. Supreme expected that upon filing its December 17, 2012 bid protest that it would obtain a "statutory stay" of ANHAM's ability to commence performance of the SPV contract, thereby inducing continuation of purchase orders from the government under the Second Bridge Contract.

97. On December 21, 2012 DLA decided that it would not issue a stop work order because the second bid protest appeared to be without merit. On January 3, 2013, Supreme filed a request for declaratory and injunctive relief to enforce the "statutory stay" and that request was granted by the Court of Federal Claims on February 19, 2013. The next day DLA issued a stop work order to ANHAM on February 20, 2013.

98. Supreme knew at the time it filed its second bid protest and requested declaratory and injunctive relief to obtain the benefit of the "statutory stay" that the filings fraudulently concealed material facts. Had DLA known that Supreme had orchestrated the armed seizure of ANHAM's Kandahar warehouse and engaged in other acts in furtherance of a conspiracy to delay the transition to ANHAM, DLA would have possessed sufficient information to deny the stay.

99. At the time Supreme's second bid protest was filed, Supreme necessarily knew that its seizure of ANHAM's Kandahar warehouse by threatening deadly force meant that it no longer possessed a satisfactory record of business integrity and ethics as required under FAR § 9.104-1(d).

100.  Supreme knew that it had been rendered a disqualified bidder rather than a "responsible business" by grossly violating the FAR's mandatory integrity and business ethics requirements.

101.  Supreme knew that in order to maintain a satisfactory record of integrity and business ethics it was required to engage in "[r]easonable and cooperative behavior" as specified under 48 C.F.R. § 42.1501 General (4), and "[b]usiness-like concern for the interest of the customer," as specified under 48 C.F.R. § 42.1501 General (7), and that its seizure of the Kandahar warehouse under threat of deadly force constituted a material consideration DLA would want to weigh before it could consider awarding the Afghanistan SPV contract to Supreme.

102.  Supreme knew that the seizure of the Kandahar warehouse violated its implied duty of good faith and fair dealing owed to the government under the terms of the Second Bridge Contract, as the core purpose thereof was to facilitate the transition to ANHAM.

103.  Supreme's second bid protest also alleged that the award to ANHAM was improper because DLA failed to adequately consider its October 26 Letter.

104.  Supreme knew or should have known that its October 26 Letter contained materially false and/or misleading statements, and that the inclusion of that letter into its second bid protest amounted to a continuation of the fraudulent conduct that commenced during the reevaluation period.

### False and Fraudulent Conduct During the Second Bid Protest

105.  During the pendency of the second bid protest Supreme and its co-conspirator SAK continued to engage in false and fraudulent activity.

106. On December 29, 2012 SAK executed Addendum No.1 to the Asset Purchase Agreement originally executed on November 10, 2012, between MECO, Haji Anwar, and SAK. As specified in this addendum, SAK purchased the Kandahar warehouse from MECO and Haji Anwar for $16.2 million effective as of December 29, 2012. Government Official B executed Addendum No. 1 as a witness along with Charles Jackson, an attorney purportedly representing Supreme.

107. To hide Supreme's involvement in the Kandahar warehouse seizure, SAK and Supreme did not execute a written Asset Purchase Agreement to transfer the Kandahar property to Supreme until, at the earliest, sometime in 2015, notwithstanding that Supreme paid SAK $16,781,600 for the land and warehouse seized from ANHAM on December 31, 2012. When the Asset Purchase Agreement was initially prepared in January 2013, it was back dated to December 29, 2012 as the effective date of the sale, but it was not executed until several years after the fact.

108. On or about December 31, 2012, Supreme initiated a cash wire transfer through UBS, debit account No. CH91 0028 4284 2024 5067 V, to SAK, IBAN account No. AE310260001024349628002, in the amount of $16,781,600. This wire transfer provided to SAK the $16.2 million required to purchase the Kandahar warehouse from MECO, plus an extra $581,600 as a payoff to SAK for assistance with the transaction and the seizure of the warehouse.

109. Supreme also made monthly payments to SAK in the amount of approximately $13,000 for the wages of "security guards" who maintained the seizure of the Kandahar warehouse.

110. On January 4, 2013, Defendant Norgaard e-mailed Defendant Sader Khail and copied Jan Langenbach, stating: "I hope you have now arrived safely into Washington. We should

when you get back to Dubai finalize the Supreme/SAK documents in relation to our agreement on the Kandahar Warehouse. We have prepared the attached two drafts that we can discuss and hopefully sign when you get back".

111. However, Norgaard admitted in a January 25, 2015 e-mail that the warehouse Asset Purchase Agreement for the Kandahar warehouse had yet to be finalized. As of that date, nearly $16.8 million in payments had been made to SAK with no executed agreements of any kind.

112. MECO was persuaded by SAK and Supreme to breach its agreements with ANHAM in exchange for a payment of $16.2 million USD and understanding that MECO would become a Supreme subcontractor. To this end, on January 8, 2013, Olivia Gendrot, a Supreme Contract Specialist, informed MECO's Haji Anwar that his company had been awarded transportation contract No. SUP-2012-0013, effective January 15, 2013. The contract provided for fixed payments for each delivery MECO made from the Kandahar warehouse to various destinations throughout Afghanistan. However, upon information and belief, no work took place under that subcontract.

113. The Kandahar warehouse was never utilized commercially by SAK, Supreme or any other party. It was seized on behalf of Supreme solely to delay and with the intention of derailing the implementation of ANHAM's SPV Contract. Supreme intended to interfere with ANHAM's ability to mobilize, and to allow Supreme to fraudulently take additional funds from the U.S. Government at rates at least 44% higher than those charged by ANHAM. To conceal the lack of use of the warehouse, Supreme orchestrated pro-forma movements of water into the warehouse after persons began questioning the absence of any commercial activities at the site.

114. Much of the Kandahar warehouse complex was dismantled and sold off. The seizure of the Kandahar warehouse by an armed militia threating deadly force and selling off the contents and infrastructure of the seized property constitutes a form of and otherwise amounts to armed robbery.

115. Supreme, represented by Defendant Norgaard, met with Defendant Sader Khail in Washington, D.C., as part of Defendants' continuing conspiracy and fraudulent conduct to wrongfully seize and retain control over the Kandahar warehouse.

116. Supreme's second bid protest was denied on March 27, 2013, at which time ANHAM was informed that the stop work order previously issued on February 20, 2013, was no longer in effect.

117. But for the second bid protest and the illegal seizure of the Kandahar warehouse by the Defendants, ANHAM would have been able to commence performance of the ANHAM SPV Contract at the conclusion of the six-month ramp-up period on December 22, 2012.

**ANHAM's Response to the Warehouse Seizure**

118. ANHAM and its representative AFGS had no prior notice and had not been provided with either an explanation or justification for the armed seizure of the Kandahar warehouse facilities.

119. On December 23, 2012, ANHAM's agent and Country Manager, Kabir Mohammad Arghandiwal, filed a petition with the National Assembly of Afghanistan's Petitions and Complaints Committee seeking redress over the seizure of ANHAM's Kandahar warehouse.

120. The petition outlined the Agreement and Bill of Sale entered between ANHAM, MECO, and partners, and outlined what ANHAM knew at that time—that its employees,

contractors, and security force were "forcefully removed" by an armed, private militia unaffiliated with the Afghan Public Protection Force ("APPF") and that ANHAM did not receive notice or justification for why the seizure occurred or who was responsible for the seizure.

121. The petition warned that further inability to access and utilize the site would cause ANHAM to "fail under…contractual obligations which constitute billions of dollars."

122. On December 27, 2012, Arghandiwal received a response to his petition from Alhaj Obaidullah Barekzai, Director of Petitions and Complaints Committee. Barekzai confirmed that the Petitions and Complaints Committee reviewed ANHAM's petition and "decided that Ministry of Interior should visit the Land with proper security forces…and resolve the issue…Ministry of Interior should clean the Land from the unauthorized forces and hand over the Land to the head of this Company (ANHAM) to resume their work."

123. On January 4, 2014, the Supreme Court of the Islamic Republic of Afghanistan, Appeal Courts Division of Kabul Province, issued an injunction in favor of ANHAM against, among others, Stephen Orenstein and other owners of Supreme, and the owner of SAK, pending the outcome of any judicial proceeding.

124. The injunction called for "all the installations, buildings, cold storage warehouses, appliances, equipment, and construction material, which are subject to dispute…be taken out of the control of current occupiers [Supreme]…[and] after the conclusion of the lawsuit, they may be transferred to their rightful owner [ANHAM]."

125. The Afghan official lawfully tasked with enforcing the injunction was Government Official B. However, Official B was receiving payoffs from SAK that included Official B having

been placed on SAK's employee payroll and receiving other cash payments. These payoffs caused Official B to not enforce the injunction.

126.  Government Official B traveled to Dubai to formally witness and sign the Asset Purchase Agreement Addendum No. 1 between MECO and SAK, which provided for the transfer of the Kandahar warehouse to SAK for $16.2 million USD.

127.  Upon information and belief, Government Official B received a payoff for witnessing Addendum No. 1 to Supreme's Asset Purchase Agreement for the Kandahar warehouse. Knowledge of these payments is uniquely within the control of SAK and Supreme.

128.  The payments made to Government Officials A and B amount to violations of the Foreign Corrupt Practices Act (FCPA). These FCPA violations were initiated with the intent to force DLA to continuing obtaining supplies and services from Supreme and were concealed from the DLA.

**The Seizure of the Kandahar Warehouse is Reported to the Government**

129.  On January 16, 2013 ANHAM reported to the U.S. Government what limited information it knew about the seizure of its Kandahar warehouse. At that time, Beau Lendman, an ANHAM Senior Vice President, informed DLA Troop Support via e-mail that "an armed private military has occupied the property surrounding [ANHAM's] Kandahar Warehouse and is interfering with our use of the Facility."

130.  Lendman reported to the Government that the militia was "neither affiliated with the Afghan Military, Afghan Police nor the Afghan Public Protection Forces." Lendman's e-mail stated that ANHAM had already filed two legal proceedings in Afghanistan, and the company expected to have control of its warehouse back prior to mobilizing under the ANHAM SPV Contract. Lendman disclosed that ANHAM had been advised that the

militia reported to an individual who served as a primary subcontractor under one of Supreme's fuel delivery contracts.

131. On January 17, 2013 DLA requested that ANHAM respond to four questions regarding the Kandahar warehouse and further advised that prior to the implementation phase of the ANHAM SPV Contract ANHAM had to have all infrastructures completed at both its Bagram and Kandahar facilities.

132. On January 22, 2012 Beau Lendman responded to the questions posed by DLA. However, ANHAM still remained mostly in the dark about what had transpired. The response explained that the militia occupying the Kandahar warehouse site threatened armed conflict should ANHAM attempt to enter the site to perform work.

133. On January 31, 2013, DLA Troop Support Contracting Officer Dennis Strolle e-mailed ANHAM that, per the SPV contract, "all infrastructures shall be completed at your Kandahar facility...by March 7, 2013."

134. On February 1, 2013 DLA required ANHAM to advise DLA in writing how it intended to perform on its Afghanistan contract if the Kandahar facility was no longer part of the supply equation.

135. On February 4, 2013 ANHAM responded by providing DLA with a back-up plan that assumed that ANHAM would regain control over its Kandahar warehouse.

136. On February 12, 2013, ANHAM transmitted a letter to the Chief Counsel of DLA Troop Support, stating that the Afghan Government was "actively conducting a criminal investigation into the illegal seizure of ANHAM's Kandahar [sic] facility by an armed private militia." The letter reported that it was ANHAM's understanding that

"Supreme...has been involved in financing, and/or otherwise engineering, the seizure to force the extension of Supreme's current prime vendor contract."

137. Accompanying the February 12, 2013 letter was a list of Afghan officials and private citizens ANHAM believed had information relevant to the allegations and would cooperate with U.S. officials.

138. On March 27, 2013, ANHAM's Afghan subcontractor, AFGS, e-mailed a letter to the Afghan Investment Support Agency ("AISA") detailing the issues surrounding the seizure of the Kandahar warehouse. The letter stated that ANHAM was "in possession of information that our land and improvements were purportedly and illegally sold to one Haji Obaidullauh Sarder [sic] Khail...a primary subcontractor to Supreme Food Service, GmbH, a foreign business competitor of ANHAM." However, until Relator Asadullah Saderkhail came forward in May 2015, ANHAM had insufficient evidence to prove its suspicions.

139. AFGS further alleged "that the purported illegal seizure and sale were at the behest and planning of Supreme...in order to seek an illegal competitive advantage regarding certain U.S. Government Contracts that have been award[ed] to ANHAM."

140. On April 6, 2013 Jay Ward, ANHAM's Chief Operating Officer, e-mailed Capt. Michael Hansen of DLA Troop Support, that "[ANHAM] doubt[s] that the Kandahar [warehouse] will be returned in time to meet initial operating requirements."

141. On April 8, 2013 ANHAM's Beau Lendman e-mailed DLA Troop Support with an update on substantive modifications to its SPV proposal. Lendman informed DLA Troop Support that the Kandahar warehouse was still under control of the private militia, but the seizure was non-detrimental to ANHAM's ability to perform under the contract, as ANHAM was trying to move forward with implementing a contingency plan involving the building of

another warehouse at Camp Star, coupled with the supplemental utilization of ANHAM's warehouse in Bagram. This initial understanding ultimately proved to be incorrect. Instead, the failure to regain control of the Kandahar warehouse substantially delayed implementation of the ANHAM SPV Contract.

142. ANHAM was forced to replace its lost Kandahar facility by hastily constructing an emergency warehouse and foodservice facility known as Camp Star.

143. The Camp Star facility, which cost ANHAM an additional $10 million to construct, was much smaller than the seized Kandahar warehouse, and the construction delay and reduced size of the replacement facility prevented ANHAM from making deliveries to southern Afghanistan locations, which necessarily delayed and reduced ANHAM's performance under its SPV Contract.

144. On April 15, 2013, representatives of Supreme operating a vehicle with a Supreme badge on the windshield covertly trespassed onto ANHAM's Bagram warehouse property with photographic equipment. Occupants of the vehicle included Supreme Operations Manager Jim Fafferty. Evidence of the trespass is found in an Afghan Public Protection Force (APPF)/Scimitar RMC Incident Report, which confirmed that evidence existed to conclude that Supreme personnel entered ANHAM's Bagram warehouse location and took pictures. This incident was reported to DLA in a letter ANHAM transmitted to DLA dated April 23, 2013.

145. On information and belief, the purpose of Supreme's trespass and industrial espionage at the Bagram warehouse was to plan a means of sabotaging ANHAM's operations there. The plan was abandoned only when Supreme's personnel were encountered and photographed on location.

## Supreme Denies Wrongdoing

146. Upon information and belief, Supreme misrepresented or failed to disclose its role in the Kandahar warehouse seizure and the delay in implementation of ANHAM's SPV Contract in response to questions from DLA following ANHAM's January 16, 2013 disclosure to DLA of the illegal seizure of its Kandahar warehouse.

147. On May 24, 2013, representatives from ANHAM and Supreme met separately with DLA at Supreme's primary offices in Dubai. A draft agenda circulated prior to the meeting reveals that the topic of the meeting was transition of the SPV contract from Supreme to ANHAM, including "[w]ork details and critical tasks for Anham to assume full capability for the SPV contract mission by Dec 2013."

148. In a follow-up e-mail sent after the meeting on May 28, 2013, to Supreme's Orenstein and ANHAM's A. Huda Farouki, Vice Admiral Mark Harnitchek, DLA Director, recapped the meeting that had just been held in Dubai. Harnitchek stressed the importance of a "smooth transition" of the SPV contract, specifically with regards to the Kandahar warehouse facility, over which, Harnitchek noted, "both companies have some form of claim of ownership." He stated he would not tolerate "meddling or intrusive actions" by Supreme.

149. Upon information and belief, Supreme did not disclose its illegal seizure of ANHAM's Kandahar warehouse to DLA during or after this meeting but rather made misrepresentations to DLA denying any role in the seizure when confronted by DLA with ANHAM's suspicion that Supreme was behind the seizure.

150. Upon information and belief, Supreme withheld the information that it was actively preventing the transition of the SPV contract through espionage at the Bagram warehouse

and its continued illegal seizure of ANHAM's Kandahar warehouse while representing to DLA that it was actively assisting with the requested "smooth transition."

151. Following the May 24, 2013 meeting, Lourdes Valentin of DLA Troop Support e-mailed ANHAM to demand "substantiating documentation regarding the occurrence at its Kandahar facility" and stated that ANHAM "must provide detailed information, as well as supporting documentation, regarding the steps it has taken, or will take, and the person(s) and/or office(s) ANHAM has contacted, or will contact, with associated timeframes."

152. On June 3, 2013, ANHAM's Chief Executive Officer, A. Huda Farouki, met privately with Defendant Stephen Orenstein. During this meeting, Orenstein admitted that Supreme had obtained ownership of the Kandahar warehouse but contended it did so to meet Supreme's legitimate business needs.

153. On June 3, 2013 ANHAM responded to DLA's request made by Valentin for substantiating documentation by submitting four items ANHAM had as of that time: 1) ANHAM's complaint to the Upper and Lower houses of the Afghan Parliament; 2) responses from the Upper and Lower houses confirming that an investigation would take place; 3) ANHAM's complaint to AISA; and 4) the APPF's findings that the Kandahar warehouse site was being illegally held by an armed militia. On June 03, 2013 Farouki emailed Vice Admiral Harnitchek to alert DLA that Orenstein admitted during the May 28th private meeting held between Farouki and Orenstein that Supreme was in possession ANHAM's Kandahar warehouse. Farouki noted that Orenstein's claim that Supreme obtained possession because it had a need for more warehouse space was disingenuous because Supreme was in the process of closing numerous warehouses throughout the country.

154.  On June 4, 2013 Vice Admiral Harnitchek emailed Farouki acknowledging that DLA had reviewed the information ANHAM provided, and admitted that it was, in fact, "odd" that Supreme would be buying additional warehouse space, but that ANHAM had failed to provide "any 'smoking guns' regarding seizures or any other alleged untoward behavior."

155.  The perceived lack of substantiating documentation caused DLA to disregard ANHAM's assertion that the seizure of the Kandahar warehouse facility was more than a business dispute.

156.  On June 10, 2013, Orenstein emailed Farouki acknowledging that Supreme secured the use of the Kandahar warehouse for its own use. The email asserted that Supreme was not aware of the contractual relationship ANHAM had with the landowner, and that local authorities in Kandahar had thoroughly investigated ANHAM's allegations and concluded that the landowner was entitled to cancel the arrangements with ANHAM/AFGS for breach of contract. All the underlying factual assertions in the email were false. Orenstein also attached to his email a document claiming to constitute an official government report. That report was not on file with the Ministry of the Interior and was determined by the Ministry of the Interior to lack credibility. Upon information and belief, the report was a smokescreen manufactured by Supreme.

157.  Facts demonstrating that Supreme did not secure the warehouse for its own use include: (1) Supreme already had in place a long-standing operational supply infrastructure and lacked an actual business need for additional warehousing in as much as Supreme was closing down warehouses throughout the country; (2) having lost the Afghanistan SPV contract, Supreme's legitimate plans moving forward would be geared towards downsizing its supply operations, not expanding them; (3) Supreme failed to utilized the Kandahar

warehouse facility for any meaningful commercial activity (some water was placed in the warehouse to camouflage the fact that the warehouse remained vacant and unused for any commercial purpose); (4) Supreme and SAK rendered the warehouse unusable by removing and selling-off critical warehouse infrastructure and equipment installed by ANHAM; (5) the enormous sum of money Supreme wired to SAK without having a written agreement in place; (6) discussions relator Asadullah Saderkhail overheard that the seizure was specifically engineered for the purpose of interfering with ANHAM's ability to perform its Afghanistan SPV contract.

158.    On June 28, 2013 ANHAM's A. Huda Farouki responded to Orenstein's June 10th email. In addition to identifying that the factual assertions in Orenstein's email were false, Farouki attached a registered letter from the Afghanistan Ministry of the Interior ("MoI") documenting that the report Orenstein relied upon amounted to a fake report that was not on file with the MoI and according to the MoI "does not have any credibility."

159.    On September 10, 2013, Supreme and ANHAM had a second transition meeting in Dubai in which they met separately with Vice Admiral Harnitchek of DLA. On information and belief, at this meeting Defendants Orenstein and Supreme again misrepresented or failed to disclose their role in the seizure of the Kandahar warehouse and their failure to engage in good-faith attempts to facilitate the transition.

160.    On September 19, 2013 the Court of Federal Claims rejected Supreme's second bid protest, which it had filed in bad faith to delay the transition. The court noted, *inter alia*, that the October 26 Letter "accuses Anham of misrepresentation in its proposal, claims that Supreme has now dropped."

161. On September 19, 2013 Vice Admiral Harnitchek emailed Supreme and ANHAM to demand cooperation in the transition and to reiterate that DLA would not tolerate "meddling or intrusive actions" by Supreme.

162. On September 25, 2013 DLA wrote ANHAM stating, *inter alia*, "DLA Troop Support notes that Camp Star alone fails to bring Anham in compliance with the terms and conditions of its contract. Anham has offered a number of explanations for the loss of its originally proposed Kandahar warehouse, and none of its proffered excuses absolve Anham of the requirement to maintain pallet positions required by the contract."

163. DLA's September 25, 2013 letter evidences the government's general disbelief in the claim that the seizure of the Kandahar warehouse was part of a conspiracy initiated between Supreme and SAK to seize ANHAM's Kandahar warehouse to derail and/or delay ANHAM's ability to provide supplies to the government in accordance with the terms of the Afghanistan SPV contract DLA awarded to ANHAM. The resulting delay in full performance was intended to cause, and in fact did cause, the government to be charged substantially higher rates than the government would have been charged under the terms of the ANAHM SPV Contract but for the fraudulent, unlawful and illegal actions identified in this Amended Complaint.

164. Because of the conspiracy and fraudulent course of conduct set forth in this Amended Complaint, the complete transition of SPV orders from Supreme to ANHAM was delayed until November 19, 2013, resulting in Supreme overcharging the government by at least $933 million and ANHAM suffering lost revenues estimated at $1.21 billion, lost profits estimated at $182 million, and lost costs of the Kandahar warehouse facility estimated at $20 million.

**Afghan Government Concludes that the
Seizure of ANHAM's Kandahar Warehouse was Unlawful**

165. On or about August 1, 2013, the Afghanistan Ministry of the Interior ("MoI") acknowledged in response to questions posed by ANHAM, *inter alia*: (1) "no forces of the Ministry of the Interior or any other state entity were involved in the forcible eviction of the staff and labourers were expelled forcibly by armed persons belonging to Haji Obaidullah [Sader Khail]" and that "this action of theirs is contrary to law." (2) that the militia force that seized control of the Kandahar warehouse "have no legal responsibility or license to provide security to private companies;" and (3) that "the Minister of the Interior has instructed the Provincial Police Chief of Kandahar to take measures" to return the property in question to ANHAM/AFGS.

166. On January 4, 2014 the Supreme Court of the Islamic Republic of Afghanistan, Appeal Courts Division of Kabul Province, issued an injunction in favor of ANHAM against Supreme, SAK and others. This injunction was never enforced because the government official responsible for doing so, Government Official B, was corrupted by payouts Supreme's agents made to that official.

**Events Following the Transition from Supreme to ANHAM**

167. In early 2015, SAK and Supreme considered formalizing SAK's transfer of the Kandahar warehouse to Supreme in connection with a handover of physical possession of the property for which SAK had been providing security. On January 24, 2015, Defendant Sader Khail e-mailed Defendant Norgaard:

> It is good to read that you would like to prepare an agreement between SAK and Supreme. As you know that SAK have [*sic*] no benefit in these contracts from beginning...till today. We did not face problems in our other business in Afghanistan but we faced very serious problems and complications in Afghanistan due to only for these contracts (Lease and

Assets purchase). We will work on it and prepare the draft. We have to prepare the contract which should not be harmful for SAK and Supreme in future. I would not like to take anymore complication in future due to these contracts.

This e-mail establishes that SAK had no stake in the Kandahar property in its own right, acted only as an agent for Supreme and was concerned about avoiding future "complications," i.e., legal exposure, as a result of its actions.

168. On January 31, 2015, Hamuyoon Weyar, SAK's Kabul Area Manager, e-mailed SAK's general manager with an update concerning the warehouse handover. Weyar reported that he had traveled to Kandahar to complete the handover of the warehouse to Supreme's staff and informed a Supreme employee that SAK required specific documentation be signed before it would hand over control of the warehouse to Supreme.

169. The Supreme official reportedly responded by telling Weyar that Supreme would be taking control of the warehouse at 8:00 a.m. the following day regardless of whether the proper documentation was in place. Defendant Sader Khail e-mailed Defendant Norgaard to confirm that the warehouse handover would occur on February 1, 2015.

170. ANHAM did not obtain actual knowledge of the fraud scheme and additional supporting documentation until on or after May 2015 when Relator Saderkhail came forward with information and documentation demonstrating to ANHAM that Supreme and the other Defendants had engaged in a conspiracy to defraud ANHAM and the United States.

171. Relator Saderkhail has firsthand knowledge of the fact that the Kandahar warehouse was not used in any commercially reasonable way to fulfill Supreme's or SAK's business needs in the region and that the actual reason why the warehouse was seized was to interfere with ANHAM's ability to commence performance of its Afghanistan SPV contract.

172. On or after May 2015 ANHAM obtained photographic evidence showing that, following Supreme's seizure, the Kandahar warehouse was not utilized in any meaningful way. The photographs document that a small quantity of water was delivered to conceal that the Kandahar facility was never utilized for its intended purpose. The photographs further document that the location was used to house several empty shipping containers belonging to Haji Anwar.

173. On December 8, 2014, Supreme agreed to plead guilty to criminal counts of major fraud, conspiracy to commit major fraud and wire fraud against its Afghanistan SPV contract. The guilty pleas were entered by agreement as part of a December 8, 2014, criminal and civil settlement agreement that imposed $434 million in criminal and civil penalties. Orenstein was a named defendant in those civil claims.

## COUNT I

### VIOLATION OF 31 U.S.C. §§ 3729(a)(1)(A)
### (Knowingly Presenting, or Causing to be Presented, a False or
### Fraudulent Claim for Payment or Approval)

174. The allegations contained in the above paragraphs are hereby re-alleged as set forth fully above.

175. Defendants Supreme Foodservice GmbH, Supreme Group USA LLC, Sader Al Khail General Trading, LLC, Stephen Orenstein, Soren Borup Norgaard, and Haji Obaidullah Sader Khail, by and through their officers, agents, supervisors, and employees, knowingly induced the United States Government through fraudulent means into extending, or not terminating, Supreme Foodservice GmbH's prime vendor contract, SPM300-05-D-3130 and subsequent bridge contracts, by delaying Plaintiff-Relator ANHAM's performance of its prime vendor contract, SPM300-12-D-3571, in violation of 31 U.S.C. § 3729(a)(1)(A).

The delay in ANHAM's performance prevented the Government from exercising its right to terminate Supreme's contract once ANHAM would have been able to commence performance but for the Defendants' illegal seizure of the Kandahar warehouse and its bad faith and fraudulent bid protest filing on December 7, 2012.

176. Because Defendant Supreme Foodservice GmbH obtained its contract extension, or alternatively prevented the rightful termination of the contract, through fraudulent, wrongful and illegal conduct, all claims Supreme submitted to DLA after the date ANHAM would have begun performance under prime vendor contract SPM300-12-D-3571 but for the Defendants' illegal seizure of the Kandahar warehouse and bad faith and fraudulent bid protest activity, constitute false claims in violation of False Claims Act.

177. Defendants knew that their fraudulent, wrongful and illegal conduct would be material to the Government's decision to pay, and Defendants knew that their scheme would increase the Government's costs under the contracts at issue.

178. The Government would not have tolerated the increased cost had it known of the fraudulent conduct set forth in this Amended Complaint.

179. The United States has been damaged in the amount of at least $933 million—the difference between what Supreme charged the Government, at a minimum, while performing on its SPV bridge contract versus what the Government would have paid ANHAM, had ANHAM commenced performance when it was originally scheduled to—before trebling, subject to proof at trial, as a result of Defendants' knowing violations of the False Claims Act.

180. As set forth in the preceding paragraphs, Defendants knowingly violated 31 U.S.C. § 3729(a)(1)(A) and have thereby damaged the United States Government by their actions in an amount to be determined at trial by jury.

## COUNT II

### VIOLATION OF 31 U.S.C. §§ 3729(a)(1)(B)
### (Knowingly Making, Creating or Using False Records or Statements to Submit or Cause to be Submitted False Claims)

181.  The allegations contained in the above paragraphs are hereby re-alleged as set forth fully above.

182.  Defendants Sader Al Khail General Trading LLC, Stephen Orenstein, Soren Borup Norgaard, and Haji Obaidullah Sader Khail knowingly made, created or used false records or statements to submit or cause Defendants Supreme Foodservice GmbH and Supreme Group USA LLC to submit false or fraudulent claims to the United States Government for payment under prime vendor contract SPM300-05-D-3130 in violation of 31 U.S.C. § 3729(a)(1)(B).

183.  Defendants Supreme Foodservice GmbH and Supreme Group USA LLC, by and through their officers, agents, supervisors, and employees, did knowingly authorize various officers, agents, supervisors, and employees to make, use, create, or cause to be made, used or created, false records or statements to submit false claims and take the fraudulent, illegal, and wrongful actions set forth above.

184.  Defendants knowingly made, used, or created false records or statements to falsely represent to officials from the United States Government that they were not engaged in a fraudulent course of conduct and/or illegal activity concerning ANHAM's Kandahar warehouse.

185.  Defendants knowingly made, used, or created false records or statements to submit, or to cause to be submitted, false claims for payment when they knew that their fraudulent, illegal, and wrongful course of conduct was causing the United States Government to pay

substantially more than they would otherwise have paid but for the fraudulent course of conduct.

186. For example, Supreme's bid protest on December 7, 2012, and it subsequent communications with the Government, materially omitted or misrepresented its violations of FAR's mandatory integrity and business ethics regulations stemming from its illegal seizure of the Kandahar warehouse. These violations would have disqualified Supreme as a bidder for the SPV contract.

187. Additionally, Defendants materially mispresented and omitted their role in the delayed transition to the ANHAM SPV Contract by not disclosing Defendants' illegal seizure and occupation of the Kandahar warehouse to DLA during the May 23, 2013 meeting or any other previous or subsequent communications with the Government.

188. Also, Supreme continually materially misrepresented or omitted its willingness and actual effort to assist in the transition to the ANHAM SPV Contract, both through its communications with the Government and by violating explicit contractual provisions, while knowingly blocking that transition due to its continued illegal seizure of ANHAM's Kandahar warehouse and bad faith bid protest.

189. Defendants knew that their fraudulent, wrongful, and illegal conduct would be material to the Government's decision to pay, and Defendants knew that their scheme would increase the Government's costs under the contracts at issue.

190. The Government would not have tolerated the increased cost had it known of the fraudulent conduct set forth in this Amended Complaint.

191.	As set forth in the preceding paragraphs, Defendants knowingly violated 31 U.S.C. § 3729(a)(1)(B) and have thereby damaged the United States Government by their actions in an amount to be determined at trial by jury.

## COUNT III

### VIOLATION OF 31 U.S.C. §§ 3729(a)(1)(C)
### (Conspiracy to Violate the False Claims Act)

192.	The allegations contained in the above paragraphs are hereby re-alleged as set forth fully above.

193.	Defendants knowingly conspired with each other, and with others who are not named herein, known and unknown, to commit violations of 31 U.S.C. §§ 3729(a)(1)(A) and (B) as described above.

194.	As described throughout this Amended Complaint, all Defendants knew, or should have known, about the scheme to defraud the United States by fraudulently inducing the United States Government into extending, or alternatively terminating, Supreme's foodservice contract by wrongfully and illegally seizing control of ANHAM's Kandahar warehouse, thereby knowingly delaying indefinitely ANHAM's ability to commence performance on its own contract and knowingly causing the submission of false claims. By participating in this scheme, Defendants implicitly agreed to form a conspiracy to violate 31 U.S.C. § 3729.

195.	Each of the Defendants knowingly committed one or more overt acts in furtherance of the conspiracy to violate 31 U.S.C. § 3729(a)(1)(A) and (B), including but not limited to initiating the transmission and receipt of wire transfers for the sale of the Kandahar warehouse, arranging for security at the warehouse site, and proposing contract language to terminate ANHAM's contract with MECO.

196. This fraudulent, wrongful and illegal activity was done in the name of Supreme Foodservice GmbH, Sader Al Khail General Trading, and other unnamed individuals and corporate co-conspirators.

197. Defendants knew, or should have known, that their fraudulent, wrongful and illegal conduct would be material to the Government's decision to pay, and Defendants knew, or should have known, that their scheme would increase the Government's costs under the contracts at issue.

198. The Government would not have tolerated the increased cost had it known of the fraudulent conduct set forth in this Amended Complaint.

199. As set forth in the preceding paragraphs, Defendants knowingly conspired to violate 31 U.S.C. § 3729(a)(1)(A) and (B), and they have thereby damaged the United States Government by their actions in an amount to be determined at trial by jury.

## COUNT IV

### VIOLATION OF 31 U.S.C. §§ 3729(a)(1)(A)
### (Implied False Certification as to 48 C.F.R. § 9.104)

200. The allegations contained in the above paragraphs are hereby re-alleged as set forth fully above.

201. Upon seizing ANHAM's Kandahar warehouse under threat of deadly force, Supreme knowingly engaged in a disqualifying act because it could no longer satisfy the 48 C.F.R. § 9.104-1(d) mandatory integrity and business ethics responsibility requirement.

202. 48 C.F.R. § 9.103(a) provides that "[p]urchases *shall* be made from, and contracts shall be awarded to, responsible prospective contractors *only*" (emphasis added), and § 9.103(b) establishes that "no purchase or award shall be made unless the contracting officer makes

an affirmative determination of responsibility." The required mandatory responsibility determinations referenced above are set forth at 48 C.F.R. § 9.104 and include a requirement that DLA make an affirmative determination that Supreme possessed "a satisfactory record of integrity and business ethics." 48 C.F.R. § 9.104-1(d) required Supreme to have engaged in "[r]easonable and cooperative behavior" and "[b]usiness-like concern for the interest of the customer." 48 C.F.R. § 42.1501 General (4) and (7).

203. Supreme further knew that government knowledge of Supreme's role in the unlawful seizure of ANHAM's Kandahar warehouse would be material to the government's affirmative responsibility determination.

204. The duty of good faith and fair dealing is implied in every government contract, and it forbids a contracting party from acting in such a way as to destroy the reasonable expectations of the other party regarding the benefits provided by the contract. Supreme knew that its role in seizing the Kandahar warehouse violate its duty of good faith and fair dealing implied in its bridge contract, the core purpose of which was to facilitate the transition to ANHAM.

205. Pursuant to 48 C.F.R. § 9.103(a), the failure to satisfy the mandatory integrity and business ethics responsibility requirement was a material term and condition applicable to Supreme's prime vendor contract SPM300-05-D-3130, to the bridge contracts issued in connection therewith, and with respect to the prime vendor contract that was the subject of Supreme's second bid protest, SPM300-12-D-3571.

206. Supreme's concealment of its role in the seizure of the Kandahar warehouse prevented DLA from deploying various methods to counter Supreme's fraudulent behavior, including

imposition of contractual penalties and remedies, negative CPARs ratings, and suspension and debarment proceedings.

207. The knowing concealment of Supreme's role in the unlawful and unethical seizure of ANHAM's Kandahar warehouse rendered the filing by Supreme of its second bid protest a fraudulent action such that every invoice it submitted after seizing the warehouse would amount to an implied false certification of 48 C.F.R. § 9.104-1(d).

208. Every invoice Supreme submitted to DLA after it seized ANHAM's Kandahar warehouse constitutes a false claim because the government was only authorized to obtain purchases from and award contracts to entities that satisfied the § 9.104-1(d) integrity and ethical business responsibility standard, and Supreme knew that its course of fraudulent conduct that included the armed seizure of the Kandahar warehouse established that this standard could no longer existed.

As set forth in the preceding paragraphs, Defendants' implied false certification of § 9.104-1(d) constitutes a knowing violation of 31 U.S.C. § 3729(a)(1)(A) such that any claims Supreme submitted after the seizure of the Kandahar warehouse constitutes a false claim. Supreme thereby damaged the United States Government in an amount to be determined at trial by jury.

## COUNT V

### VIOLATION OF 31 U.S.C. §§ 3729(a)(1)(A)
### (Implied False Certification as to Claims Filed After
### Supreme Submitted Its October 26, 2012 Letter to DLA)

209. The allegations contained in the above paragraphs are hereby re-alleged as set forth fully above.

210. On October 26, 2012, Supreme submitted to DLA a letter it knew to constitute materially false and/or misleading statements.

211. The submission of the October 26, 2012 letter was part of an overarching fraud scheme aimed at preventing and/or delaying ANHAM from commencing performance under the Afghanistan SPV contract.

212. The fraud scheme was material to the government's decision whether to continue contracting with Supreme and/or to commence debarment and/or criminal proceedings.

213. Every invoice Supreme submitted after October 26, 2012 constitutes a false claim in violation of 31 U.S.C. § 3729(a)(1)(A). Supreme thereby damaged the United States Government by their actions in an amount to be determined at trial by jury.

## COUNT VI

### VIOLATION OF 31 U.S.C. §§ 3729(a)(1)(A)
### (Implied False Certification as to the Second Bid Protest and Statutory Stay)

214. The allegations contained in the above paragraphs are hereby re-alleged as set forth fully above.

215. On December 17, 2012, Supreme filed a GAO protest challenging the December 7, 2012 re-awarding of the Afghanistan SPV contract to ANHAM. Supreme initiated this bid protest in bad faith and as part of its continuing course of fraudulent conduct. Supreme anticipated that by filing its second bid protest it would obtain a "statutory stay" of the award of the Afghanistan SPV contract to ANHAM.

216. Supreme knew that obtaining the "statutory stay" would result in delaying the date that ANHAM could commence performance. Supreme further knew and intended that this delay extend the period in which Supreme would continue charging DLA rates that were 44% higher than what DLA would have been charged.

217. DLA initially denied Supreme the statutory stay after Supreme filed its second bid protest of the re-award of the Afghanistan SPV contract SPM300-12-D-3571 to ANHAM.

218. Supreme filed for declaratory and injunctive relief demanding that the statutory stay be imposed. Supreme's filing was intentionally false and misleading because Supreme knew that its fraudulent conduct constituted a disqualifying act.

219. Supreme prevailed on its demand for declaratory and injunctive relief and the statutory stay was imposed, thereby halting ANHAM's performance. However, Supreme knew that its seizure of the Kandahar warehouse was material to its entitlement to the statutory stay and knew or should have known that had Supreme admitted to its criminal and unlawful conduct, the stay request would have been denied.

220. Supreme's concealment of its role in the seizure of the Kandahar warehouse prevented DLA and ANHAM from deploying various methods to defeat and counter Supreme's request for declaratory and injunctive relief and would have terminated the second bid protest forthwith.

221. Supreme necessarily understood that had the government known that Supreme conspired to seize ANHAM's Kandahar warehouse by threat of deadly force that DLA would have possessed grounds to summarily dismiss Supreme's second bid protest and with it Supreme's request for injunctive and declaratory relief.

222. Every invoice Supreme submitted because of obtaining the statutory stay constitutes a false claim in violation of 31 U.S.C. § 3729(a)(1)(A). Supreme thereby damaged the United States Government by its actions in an amount to be determined at trial by jury.

## COUNT VII

### VIOLATION OF 31 U.S.C. §§ 3729(a)(1)(A)
### (Implied False Certification as to 48 C.F.R. § 52.203-13)

223. Effective December 12, 2008, the FAR was amended to implement a mandatory disclosure rule for government contractors such that contractors had an affirmative duty to disclose to

the relevant Inspector General and Contracting Officer the existence of "credible evidence" of a violation of federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the U.S. Code, a violation of the civil False Claims Act, or a "significant overpayment" on a government contract. The failure to disclose any such violation is grounds for suspension or debarment.

224. Effective June 22, 2012, Supreme and DLA executed a contract extension from December 13, 2012 through December 12, 2013. Therein, Supreme agreed to and was bound to comply with the Contractor Code of Business Ethics and Conduct provision set forth in FAR § 52.203-13.

225. The Contractor Code Of Business Ethics And Conduct provision appearing at paragraph (b)(3)(i) states that: "The Contractor shall timely disclose, in writing, to the agency Office of the Inspector General (OIG), with a copy to the contracting officer, whenever, in connection with the award, performance, or closeout of this contract or any subcontract thereunder, the Contractor has credible evidence that a principal, employee, agent, or subcontractor of the Contractor has committed- (A) A violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code; or (B) A violation of the civil False Claims Act (31 U.S.C. 3729-3733)."

226. Supreme and SAK never intended to and, in fact, did not comply with the Contractor Code of Business Ethics and Conduct reporting obligation as set forth in FAR § 52.203-13(b)(3)(i).

227. Pursuant to FAR § 52.203-13(b)(3)(i), Supreme was required to report to the Department of Defense OIG and to the DLA contracting officer credible evidence that SAK and/or

Supreme were involved with issuing payments to government officials to illegally seize control of ANHAM's Kandahar warehouse.

228. The underlying fraud scheme as set forth in this Amended Complaint includes money Supreme paid to SAK that was intended to be used for and, was in fact, used to pay bribes, gratuities, and gifts to Government Officials A and B and to SAK. Those remunerations were critical to Supreme's ability to seize through fraudulent means ANHAM's Kandahar warehouse such that the failure to report those payments to the OIG and DLA contracting officer constituted violations of Supreme's FAR § 52.203-13 reporting requirements.

229. The bribes, gratuities and gifts paid to Government Official A included a payment of approximately $300,000 that came from Supreme for his assistance in providing the armed militia that seized ANHAM's Kandahar warehouse. In 2012, Government Official A also obtained additional payments, including a cash deposit of AED 367,000 ($100,000 U.S. cash equivalent). This cash payment was deposited into Government Official A's bank account at the express and direct instruction of Defendant Sader Khail. Other payments made to Government Official A include paying for family travel that transpired between June 2012 and January 2015.

230. Government Official B likewise received payments from SAK for his assistance with the Kandahar warehouse seizure. These payoffs included placing Government Official B on the SAK company payroll at the rate of AED 7,000 (approximately $1,900 U.S.) per month during the Kandahar warehouse seizure.

231. Supreme knew or had reason to believe that payments it made to SAK for seizing ANHAM's Kandahar warehouse would be passed on to Government Official A.

232.   Government Official B was on SAK's payroll. Government Official B received payments for his role in supplying the armed militia that was responsible for seizing the Kandahar warehouse. Those payments commenced with the seizure of the Kandahar warehouse and continued thereafter for several years.

233.   Government Official B traveled to Dubai to formally witness and sign the Asset Purchase Agreement Addendum No. 1 between MECO and SAK.

234.   Supreme knew or had reason to believe that payments it made to SAK for seizing ANHAM's Kandahar warehouse would be passed on to Government Official B.

235.   With respect to each and every invoice it submitted to DLA on or after the June 22, 2012 effective date of the Second Bridge Contract, Supreme impliedly certified compliance with FAR § 52.203-13, knowing that its subcontractor, SAK, and Supreme itself, were engaged in violations of the Foreign Corrupt Practices Act ("FCPA") and other federal laws prohibiting the bribing and rewarding of high-ranking Afghan government officials for the purpose of seizing ANHAM's Kandahar warehouse.

236.   Pursuant to FAR § 52.203-13, Supreme and SAK were obligated to disclose any known violation of the Foreign Corrupt Practices Act ("FCPA") found in 15 U.S.C. §§ 78dd-1, *et seq*. The failure to disclose such known payments constitutes a knowing and intentional violation of FAR § 52.203-13.

237.   Pursuant to FAR § 52.203-13, Supreme and SAK were obligated to disclose any known violation of the mail and wire fraud statutes (18 U.S.C. §§ 1341–1343), fraud and false statements statutes (18 U.S.C. § 1001 et seq.), and the conspiracy statute (18 U.S.C. § 371). The failure to make such disclosures constitutes a knowing violation of FAR 52 .203-13.

238. With respect to each and every invoice it submitted to DLA on or after June 22, 2012, Supreme impliedly certified compliance with FAR § 52.203-13, knowing that its subcontractor, SAK, and Supreme itself, were engaged in violations of the mail and wire fraud statutes (18 U.S.C. §§ 1341–1343), fraud and false statements statutes (18 U.S.C. § 1001 et seq.), and the conspiracy statute (18 U.S.C. § 371).

239. DLA was misled and deceived as to Supreme's and SAK's active concealment of payments made to Government Officials A and B. Such conduct materially violated FAR § 52.203-13.

240. On or about November 10, 2010 DLA entered into its first bridge contract with Supreme. Upon information and belief this bridge contract incorporated FAR § 52.203-13. On information and belief, Supreme's and SAK's payments to government officials A and B were ongoing or otherwise commenced on or after November 10, 2010, such that the invoices Supreme submitted under its first bridge contract would constitute false claims.

241. As set forth in the preceding paragraphs, Defendants knowingly violated 31 U.S.C. § 3729(a)(1)(A) and thereby damaged the United States Government by their actions in an amount to be determined at trial by jury.

## COUNT VIII

### VIOLATION OF 31 U.S.C. §§ 3729(a)(1)(A)
### (Implied False Certification as to 48 C.F.R. § 52.203-7)

242. The underlying fraud scheme included money paid to SAK to pay bribes and/or paying money and/or things of value to Government Officials A and B to improperly obtain or reward favorable treatment in connection with Supreme's prime vendor contract."

243. FAR § 52.203-7 ("Anti-Kickback Procedures" clause) imposes liability under the Anti-Kickback Act (AKA) to any person who makes a payment to any other person involved in

the federal procurement process for the purpose of obtaining favorable treatment. The AKA defines the term "kickback" as "any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind that is provided to" a prime or subcontractor or its employees "to improperly obtain or reward favorable treatment in connection with a prime contract or subcontract relating to a prime contract."

244. Supreme's payments to SAK were rendered for the purpose and the intent to cause Supreme's subcontractor to issue payments and provide favorable treatment by Government Officials A and B to delay ANHAM's ability to commence contract performance.

245. DLA was misled and deceived as to Supreme's and SAK's active concealment of payments made to Government Officials A and B. Such conduct materially violated FAR § 52.203-7.

246. As set forth in the preceding paragraphs, Defendants knowingly violated 31 U.S.C. § 3729(a)(1)(A) and thereby damaged the United States Government by their actions in an amount to be determined at trial by jury.

## COUNT IX

### VIOLATION OF 31 U.S.C. §§ 3729(a)
### (Implied False Certification under the Prevention Doctrine)

247. Supreme's Second Bridge Contract was set to expire once ANHAM was able to commence full performance.

248. ANHAM's commencement of deliveries under its new contract was a condition subsequent to the Supreme bridge contract that would establish the termination date of Supreme's bridge contract.

249. Supreme prevented that condition from occurring through its overt and covert acts in furtherance of a criminal conspiracy that commenced in mid-October 2012.

250. Because Supreme prevented, hindered, and/or delayed fulfillment of the condition subsequent, its bridge contract terminated as of the date ANHAM was originally expected to commence deliveries.

251. Supreme knowingly and intentionally continued billing the government as though the contract had not terminated and denied that it engaged in any wrongdoing concerning ANHAM's Kandahar warehouse.

252. Because the government was entitled to terminate the bridge contract once ANHAM was able to perform under its competitively-bid contract and had stated its intention to do so, it was a half-truth and a fraud for Supreme to bill for goods delivered under the bridge contract after Dec. 22, 2012, without disclosing that termination of the bridge contract had been prevented by Supreme's fraudulent, criminal acts.

253. Supreme thereby impliedly certified that it had not interfered with the government's contractual right to terminate the bridge contract and commence orders under the new ANHAM contract.

254. Every invoice Supreme submitted to DLA after ANHAM was expected to commence full performance constitutes a false claim.

255. As set forth in the preceding paragraphs, Defendants knowingly violated 31 U.S.C. § 3729(a)(1)(A) and thereby damaged the United States Government by their actions in an amount to be determined at trial by jury.

## COUNT X

### CONSPIRACY TO COMMIT FRAUD
### (Violation of Va. Code § 18.2-499, 500)

256.   This Count is brought solely in the name of ANHAM.

257.   The allegations contained in the above paragraphs are hereby re-alleged as set forth fully above.

258.   Defendants conspired and colluded with each other to carry out a preconceived plan to seize ANHAM's Kandahar warehouse to unjustly enrich themselves by overbilling the United States Government in violation of law by preventing ANHAM from commencing performance of the SPV contract work the government asked ANHAM to perform.

259.   Defendants, amongst and between each other, engaged in concerted action to intentionally, purposefully, and without lawful justification cause injury to ANHAM's reputation, trade, and business opportunity.

260.   As a result of such concerted action, ANHAM lost revenue of an estimated $1.21 billion, estimated lost profits of $182 million, and $20 million representing the estimated cost of securing the land and constructing the Kandahar warehouse, and suffered other damages in an amount to be determined at trial by jury.

## COUNT XI

### TORTIOUS INTERFERENCE WITH
### AN EXISTING OR PROSPECTIVE CONTRACT

261.   This Count is brought solely in the name of ANHAM.

262.   The allegations contained in the above paragraphs are hereby re-alleged as set forth fully above.

263. ANHAM entered its SPV Contract with the United States Government, the existence of which was known to Supreme and SAK.

264. Supreme and SAK, by and through their principals, as the architects of the scheme to seize ANHAM's Kandahar warehouse, did so intending to cause ANHAM to delay and otherwise breach ANHAM's SPV Contract.

265. Supreme and SAK, by and through their principals, knowingly and intentionally interfered with ANHAM's ability to perform its SPV Contract and did so with the intent to disrupt ANHAM's contractual relationship with the Government and to cause the Government to extend its use of Supreme as its prime supply vendor in Afghanistan. The seizure of ANHAM's Kandahar warehouse was engineered with the intended purpose of interfering with ANHAM's contractual relationship with the Government.

266. Supreme's tortious interference extended to ANHAM's attempt to establish its Bagram warehouse. Such interference including paying newspapers to write false articles, organizing local protests, involving various political processes in Afghanistan, and trespassing upon the premises of the Bagram warehouse to take photographs to plan sabotage of that warehouse.

267. But for the conduct of Defendants, ANHAM would have executed its SPV Contract as planned. As a result of said tortious interference, ANHAM was deprived of an estimated $1.21 billion in revenue, estimated lost profits of $182 million, costs of securing the Kandahar warehouse estimated at $20 million and other damages in an amount to be determined at trial by jury.

## COUNT XII

### TORTIOUS INTERFERENCE WITH
### BUSINESS RELATIONS

268. This Count is brought solely in the name of ANHAM.

269. The allegations contained in the above paragraphs are hereby re-alleged as set forth fully above.

270. ANHAM entered into its SPV Contract with the United States Government, the existence of which was known to Supreme and SAK.

271. Supreme and SAK by and through their principals, as the architects of the scheme to seize ANHAM's Kandahar warehouse, did so intending to cause ANHAM to delay and otherwise breach ANHAM's SPV Contract.

272. Supreme and SAK, by and through their principals, knowingly and intentionally interfered with ANHAM's ability to perform its SPV Contract and did so with the intent to disrupt ANHAM's contractual relationship with the Government and to cause the Government to extend its use of Supreme as its prime supply vendor in Afghanistan. The seizure of ANHAM's warehouse was engineered with the intended purpose of interfering with ANHAM's contractual relationship with the Government.

273. Supreme's tortious interference extended to ANHAM's attempt to establish its Bagram warehouse. Such interference including paying newspapers to write false articles, organizing local protests, involving various political processes in Afghanistan, and trespassing upon the premises of the Bagram warehouse to take photographs to plan sabotage of that warehouse.

274. But for the conduct of Defendants, ANHAM would have executed its SPV Contract as planned. As a result of said tortious interference, ANHAM was deprived of an estimated

$1.21 billion in revenue, estimated lost profits of $182 million, costs of constructing the Kandahar warehouse estimated at $20 million and other damages in an amount to be determined at trial by jury.

## COUNT XIII

### CONVERSION OF PROPERTY

275. This Count is brought solely in the name of ANHAM.

276. The allegations contained in the above paragraphs are hereby re-alleged as set forth fully above.

277. Defendants knowingly seized ANHAM's Kandahar warehouse and all other physical property located at that location, which ANHAM owned or held a right to possess.

278. Defendants wrongfully exercised dominion and control over the property, thereby depriving ANHAM of its lawful possession.

279. ANHAM was damaged in the full amount of the cost of constructing and storing warehousing materials, and damages otherwise caused by the loss of use of said property in an amount to be determined at trial by jury.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff-Relators, on behalf of the United States of America and themselves, pray as follows:

(a) That this Court enter a judgment against all Defendants in an amount equal to three times the amount of damages sustained by the United States because of the fraudulent conduct described in this Amended Complaint and appropriate civil penalties as required by law;

(b) That, because all Defendants are responsible for violations of 31 U.S.C. §§ 3729(a)(1)(A), (B), & (C) as described herein, all Defendants are jointly and severally liable for the full amount of damages and civil penalties awarded in this case;

(c) That each Defendant be held jointly and severally liable for a civil penalty, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, for each false record, statement, and/or certification made by any Defendant to U.S. Government officials;

(d) That Plaintiff-Relators and the United States be awarded all reasonable attorney fees and costs incurred, with interest, including expert witness fees;

(e) That Plaintiff-Relators be awarded an amount that the Court decides is reasonable, which shall be not less than 15%, nor more than 30%, of the proceeds awarded to the United States from a judgment in this action, settlement of the claims, and/or any alternative remedies under the False Claims Act, 31 U.S.C. §§ 3729(a)(1), 3737(c)(5), (d), including but not limited to proceeds from any related administrative, criminal, or civil actions, including proceedings brought pursuant to 42 U.S.C. § 7413, and the monetary value of any equitable relief, fines, restitution, or disgorgement to the United States and/or third parties;

(f) That Plaintiff-Relators and the United States be awarded pre-judgment interest on all monies awarded;

(g) That Plaintiff-Relators be granted any other relief set forth in the False Claims Act which was not specifically referenced above;

(h) That Plaintiff-Relators be granted all other relief as the Court may deem just and proper;

(i) That ANHAM obtain all relief it is entitled to because of the damages suffered with respect to its ancillary claims set forth in Counts X to XIII, including but not limited to

compensatory and punitive damages, and statutory attorney fees and treble damages as to

ANHAM's Virginia Business Conspiracy Claim.

## JURY TRIAL DEMANDED

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff-Relators and Plaintiff

ANHAM, respectively, hereby demand a jury trial as to all causes of action.

Respectfully submitted,

Michael D. Kohn
D.C. Bar No. 425617
Email: mk@kkc.com
David K. Colapinto
D.C. Bar No. 416390
Email: dc@kkc.com
KOHN, KOHN & COLAPINTO, LLP
3233 P Street, N.W.
Washington, D.C. 20007-2756
Phone: (202) 342-6980

Admitted *pro hac vice*

- and -

Wm. Paul Lawrence, II
Virginia Bar # 82950
37163 Mountville Road
WATERS & KRAUS, LLP
Middleburg, VA 20117
Telephone: 540-687-6999
Fax: 540-687-5457
Email: plawrence@waterskruas.com

Attorneys for Plaintiff-Relators

September 14, 2018