IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| ANHAM FZCO and ASADULLAH SADERKHAIL, )<br>)<br>Plaintiffs/Relators, )<br>)<br>v. )<br>)<br>SUPREME FOODSERVICE GmbH, *et al.*, )<br>)<br>Defendants. ) | Civil Action: 1:17-cv-01290 (RDA/JFA) |

## ORDER

This matter comes before the Court on the Motion to Dismiss Plaintiff Relators' First Amended Complaint ("Motion") filed by Defendants Supreme Foodservice GmbH and Stephen Orenstein. Dkt. 52. Considering the Motion, Dkt. 52, the Memorandum in Support, Dkt. 52-1, the Memorandum in Opposition, Dkt. 59, the Reply, Dkt. 61, and oral argument, which occurred on December 20, 2019, the Court DENIES the Motion for the reasons stated below. Dkt. 14.

### I. Background

### A. Factual Background

### 1. Awarding of the Subsistence Prime Vendor Contract

As alleged in the Amended Complaint, Dkt. 14, the instant matter concerns contractors bidding for a competitive contract to provide food products to entities, such as the United States military, through the Subsistence Prime Vendor Afghanistan program. For purposes of adjudicating the Motion, this Court accepts all well-pled facts as true and construes the facts in the light most favorable to the plaintiff. *Nemet Chrevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009)).

1

Defendant Supreme Foodservice GmbH ("Supreme") "is a privately-held company formed under the laws of Switzerland," with its Middle East operations headquartered in Dubai, United Arab Emirates. Dkt. 14, 5. From June 2005 to December 2010, Supreme serviced its Subsistence Prime Vendor ("SPV") Contract, SPM300-05-D-3130, with the Defense Logistics Agency, Troop Support ("DLA"). In November 2010, Supreme's contract was extended through December 12, 2012, via "a non-competitive bridge contract" ("First Bridge Contract") so that DLA could issue a solicitation, award a new competitive contract, and allow the new contractor adequate time to prepare to service that contract. Dkt. 14, 7.

On April 26, 2011, DLA issued Solicitation No. SPM300-11-R-0063 for "a single indefinite-delivery/indefinite-quantity, fixed-price contract for the supply and delivery of food items to the U[nited] S[tates] military throughout various sites in Afghanistan." Dkt. 14, p. 7-8. This was "intended to replace the [SPV] [C]ontract then in place with Supreme." Dkt. 14, p. 8. DLA received proposals from Supreme and Plaintiff Relator ANHAM FZCO ("ANHAM"), amongst others. Dkt. 14, 8.

ANHAM is "a global logistics services company and supply chain contractor formed under the laws of Dubai and the United Arab Emirates." Dkt. 14, 4.

On June 19, 2012, DLA extended Supreme's First Bridge Contract through December 12, 2013 ("Second Bridge Contract") to facilitate the "adjudication of bid protests and other potential delays in the commencement of deliveries under the new [SPV] [C]ontract." Dkt. 14, 9.[1]

On June 22, 2012, DLA awarded the new SPV Contract, SPM300-12-D-3571, to ANHAM, which was set "to commence on December 22, 2012 after a six month 'ramp[-]up' period." Dkt.

---

[1] The Justification and Approval DLA prepared for the Second Bridge Contract stated that "should a competitively awarded contract be put into place ahead of the projected timeline, [Supreme's] contract extension will be terminated." Dkt 14, 9.

2

14, 8. ANHAM explained that due to "the complexity of the ANHAM SPV Contract and the logistics required to switch vendors, the [new SPV] [C]ontract included a six-month implementation phase, or 'ramp-up' period, during which Supreme would remain the principal supplier under the Second Bridge Contract until ANHAM had in place the required stock of goods to succeed Supreme and became [sic] responsible for supplying all the relevant Department of Defense Activity Address Codes set forth in ANHAM'S [new] SPV Contract." Dkt. 14, 10. The new SPV Contract was projected to span 66 months and was valued at $8 billion or more.

According to ANHAM, ANHAM won the bid because ANHAM was in the process of building two warehouses in Afghanistan, one in Bagram, the other in Kandahar, to "stor[e], process[], and deliver[] [] foodstuffs to the U[nited] S[tates] military troops, NATO troops, and associated identified parties." Dkt. 14, 8. In June 2011, ANHAM secured the location for its Kandahar warehouse from its agent, Afghan Fleet Group Services, Inc. ("ANHAM's agent"). ANHAM's agent "entered into an Agreement and Bill of Sale with Afghan Meco Logistics Services ("MECO") and its partners," resulting in ANHAM acquiring a "50% ownership interest and the right to build a warehouse on 48 Jeribs of land located in Kandahar province." Dkt. 14, 8. ANHAM "was to retain a 50% ownership stake in the full tract of land but the constructed warehouse and other improvements would all sit on portions of the tract owned 100% by ANHAM." Dkt. 14, 8. The warehouses "were substantially completed such that ANHAM anticipated that it would be prepared to commence deliveries by December 22, 2012." Dkt. 14, 11. The cost of constructing the Kandahar warehouse specifically amounted to approximately $20 million dollars. Dkt. 14, 8.

ANHAM further alleges that Supreme failed to secure the bid because Supreme "proposed to charge the government rates that were 44% higher than the rates ANHAM would charge." Dkt. 14, 9-10.

### 2. Bid Protests

Supreme filed a bid protest on July 5, 2012. Dkt. 14, 10. Consequently, DLA issued a stop work order against ANHAM effective from July 5, 2012, to December 7, 2012. Dkt. 14, 10. On October 11, 2012, the United States Government Accountability Office partially sustained the bid protest, recommending that DLA reevaluate "the Experience/Past Performance" factor. Accordingly, from October 11, 2012, to December 7, 2012, DLA reevaluated this factor. Supreme submitted a letter to DLA on October 26, 2012 ("October letter") in support of its first bid protest. Dkt. 14, p. 12.[2]

On December 7, 2012, DLA re-awarded the new SPV contract to ANHAM.

Supreme filed a second bid protest on December 17, 2012, and alleged that DLA failed to fully consider the October letter. Dkt. 14, 23. DLA initially failed to issue a stop work order against ANHAM, so Supreme requested declaratory and injunctive relief from the Court of Federal Claims. The Court of Federal Claims granted Supreme's request on February 19, 2013. Dkt. 14, 23. Complying with the order from the Court of Federal Claims, DLA issued a stop work order against ANHAM on February 20, 2013. Dkt. 14, 23.

The second bid protest was ultimately denied on March 27, 2013. Dkt. 14, 27. Thus, the stop work order was lifted as of that date.

### 3. Defendants' Alleged Conduct During the Bid Protests

#### a. October Letter

---

[2] The October letter is discussed *infra* page 4.

In the October letter, Supreme requested that DLA reexamine "the responsibility determination DLA reached as to ANHAM's ability to perform the [new SPV] [C]ontract." Dkt. 14, 12. Supreme predicated that request on "recent negative information regarding Anham [sic] and its ability to perform the [new] SPV contract" because ANHAM was "constructing [its Bagram] warehouse[3] on land it does not own and for which it does not have proper authorization to use for that purpose." Dkt. 14, p. 12. Thus, "the Afgan [sic] government and local community leaders have sought to force Anham [sic] to demolish [its Bagram] warehouse."[4] Supreme then maintains in a footnote in the October letter that it was "not sufficiently familiar with the facts and Afgan [sic] law to verify that Anham [sic] has acted unlawfully as alleged." Dkt. 14, 12. In support of Supreme's allegations, Supreme further noted "that a similar situation occurred in Kuwait when Anham [sic] improperly attempted to take control of public property, causing authorities to use bulldozers to destroy a security fence improperly constructed by Anham [sic] on public property." Dkt. 14, 12. Supreme also alleged that Afghan agencies called for the demolition of the Bagram warehouse. Dkt. 14, 13.[5] Attached to the October letter was a document purportedly from the Afghanistan National Economy Committee,[6] addressed to "Military contractors of USA." Dkt. 14, p. 13.

According to ANHAM, the contracting officer and everyone he consulted with determined that the October letter was not credible. Dkt. 14, 13. The contracting officer issued a

---

[3] While ANHAM inserted the word "Bagram" into the October letter, the conduct Supreme allegedly engaged in appears to pertain to the Kandahar warehouse.

[4] Again, ANHAM inserted the word "Bagram."

[5] Again, ANHAM inserted the word "Bagram" in its paraphrasing of the October letter.

[6] This Committee exists "within the lower house of Afghanistan's bicameral parliament." Dkt. 14, 13.

Memorandum of Record, concluding that further inquiry into the October letter was unwarranted because Supreme's allegations were unsubstantiated. Dkt. 14, 15.

### b. Seizure of the Kandahar Warehouse

In the "middle of 2012," Plaintiff Relator Asadullah Saderkhail ("Plaintiff Relator") overheard meetings between Defendants Soren Borup Norgaard ("Norgaard"), an attorney and corporate officer for Supreme, and Haji Obaidullah Sader Khail ("Sader Khail"), Chief Executive and Principal Owner of Defendant Sader Al Khail General Trading LLC ("SAK"), at SAK's Dubai office. Dkt. 14, 16. They discussed how to prevent ANHAM from commencing the new SPV Contract, concluding that the best way to do so was to take control of ANHAM's Kandahar Warehouse. Dkt. 14, 16. Those Defendants and Defendant Stephen Orenstein, Chief Executive Officer of Supreme, agreed. Dkt. 14, 16.

To effectuate the plan, on November 10, 2012, Defendant Sader Kahil entered into a Commercial Lease Agreement and Asset Purchase Agreement on behalf of SAK with Mohammad Anwar Abdulwahid ("Abdulwahid"), owner of MECO, for the land on which the Kandahar warehouse sat. Dkt. 14, 18. Those present included Afghan Government Official B, Defendant Norgaard, and Plaintiff Relator.  This allegedly resulted in a breach of MECO's June 2011 Agreement and Bill of Sale with ANHAM's agent.

In November 2012, Supreme's employees sent several electronic mail messages to Sader Khail advising that Supreme would send three vehicles, two of which contained armed guards, to the Kandahar warehouse to assert control over the site and then inventory the contents of the Kandahar warehouse. On November 23, 2012, an "armed militia" seized ANHAM's Kandahar warehouse, ANHAM's and ANHAM's agent's employees were removed by force, and were subsequently physically prevented from returning. Dkt. 14, 22. The seizure occurred with the aid

of Afghan Government Officials A and B. Dkt. 14, 20. Defendant Sader Khail directed that Afghan Government Officials A and B be paid for their assistance. Dkt. 14, 21. The contents of the Kandahar warehouse were inventoried and subsequently disposed of. Dkt. 14, 22.

On December 29, 2012, an addendum was made to the Asset Purchase Agreement between Defendant SAK and MECO reflecting that SAK purchased the Kandahar warehouse from MECO for $16.2 million, effective that day. The addendum was executed by Afghan Government Official B and an attorney representing Supreme. Dkt. 14, 25. On December 31, 2012, Supreme wired SAK approximately $16.2 million to pay MECO for the purchase of the Kandahar warehouse as well as $581,600 "as a payoff to SAK for assistance with the transaction and the seizure of the [Kandahar] warehouse." Dkt. 14, 25. Supreme also paid Defendant SAK $13,000 per month to cover the wages of those individuals securing the Kandahar warehouse. Dkt. 14, 25. In 2015, Defendants SAK and Supreme executed an Asset Purchase Agreement to transfer the Kandahar warehouse and the land on which it sat to Supreme. Dkt. 14, 25.

### 4. Communications involving the United States Government via DLA

In response to what occurred with the Kandahar warehouse, ANHAM sought relief from at least two different forums in Afghanistan.

On January 16, 2013, ANHAM reported the seizure of the Kandahar warehouse via an electronic mail message from Beau Lendman, an ANHAM Senior Vice President ("ANHAM's Senior Vice President"), to DLA. Dkt. 14, 29. ANHAM's Senior Vice President advised that the armed militia was not affiliated with the Afghan Government and that ANHAM was seeking relief in Afghanistan for the seizure of the Kandahar warehouse. ANHAM's Senior Vice President indicated that ANHAM had been informed that the armed militia reported to a subcontractor of Supreme. Dkt. 14, 30.

The next day, DLA requested that ANHAM answer four questions relating to that electronic mail message. DLA also noted that before commencing the new SPV Contract, ANHAM was required to complete both the Bagram and Kandahar facilities. Dkt. 14, 30. ANHAM also believed that DLA sent these same questions to Supreme, and that when responding, ANHAM alleges that Supreme failed to disclose its part in the seizure of the Kandahar warehouse. Dkt. 14, 33. On January 22, 2013, ANHAM's Senior Vice President responded and indicated that although ANHAM "still remained mostly in the dark about what had transpired," ANHAM was aware that an armed militia now occupied the Kandahar warehouse.

In response, on January 31, 2013, DLA Contracting Officer Dennis Strolle reiterated that in order to commence the new SPV Contract, "all infrastructures shall be completed at [the] Kandahar facility. . . by March 7, 2013." Dkt. 14, 30. On February 1, 2013, DLA directed ANHAM to respond as to how ANHAM could service the new SPV Contract if it no longer had the Kandahar warehouse. On February 4, 2013, ANHAM replied that it believed it would regain control of the Kandahar warehouse. Dkt. 14, 30. On February 12, 2013, ANHAM sent a letter to the Chief Counsel of DLA noting that the Afghan Government was investigating the seizure of the Kandahar warehouse and alleged that Supreme was involved. Dkt. 14, 31.

On April 6, 2013, Jay Ward, ANHAM's Chief Operating Officer, sent an electronic mail message to DLA, via Captain Michael Hansen, advising that ANHAM did not believe that the Kandahar warehouse would be under ANHAM's control in time to meet the new SPV Contract's requirements. Dkt. 14, 31. On April 8, 3013, ANHAM's Senior Vice President proposed modifications to the new SPV Contract, indicating that ANHAM had constructed a new warehouse at Camp Star. Dkt. 14, 32.

On May 24, 2013, DLA met separately with Supreme and ANHAM. A draft agenda was circulated indicating that "[w]ork details and critical tasks for Anham [sic] to assume full capability for the SPV [C]ontract mission by Dec 2013" was to be discussed. Dkt. 14, 33. DLA Director, Vice Admiral Mark Harnitchek ("DLA's Director, Vice Admiral") sent an electronic mail message to Defendant Orenstein and ANHAM's Chief Executive Officer, A. Huda Farouki ("ANHAM's CEO"), summarizing the meeting. Dkt. 14, 32. DLA's Director, Vice Admiral "stressed the importance of a 'smooth transition' of the SPV [C]ontract." Dkt. 14, 32. With respect to the Kandahar warehouse, it was noted that both Supreme and ANHAM "have some form of claim of ownership" and that "meddling or intrusive actions" by Supreme would not be tolerated. Dkt. 14, 33. This demonstrated to ANHAM that Supreme previously maintained to DLA that Supreme was actively assisting with the "smooth transition," and thus, Supreme failed to disclose its seizure of the Kandahar Warehouse, made "misrepresentations to DLA denying any role in the seizure," and failed to disclose conduct directed at the Bagram facility.[7] Dkt. 14, 33. DLA requested, via Lourdes Valentin, that ANHAM substantiate its allegations concerning the Kandahar warehouse. Dkt. 14, 34.

On June 3, 2013, ANHAM's CEO met with Defendant Orenstein. Defendant Orenstein "admitted that Supreme had obtained ownership of the Kandahar warehouse but" for legitimate purposes. Dkt. 14, 34. On the same day, ANHAM responded to DLA in order to substantiate the allegations surrounding the Kandahar warehouse by furnishing its complaint filed with the Afghan Parliament, the Afghan Parliament's responses, ANHAM's complaint to the Afghan Investment Support Agency, and the Afghan Public Protection Force finding that the Kandahar warehouse

---

[7] ANHAM employees reported witnessing Supreme employees trespassing and photographing the Bagram warehouse for the purpose of "espionage." Dkt. 14, 32.

was being illegally held. ANHAM's CEO also sent an electronic mail message to DLA's Director, Vice Admiral that Defendant Orenstein admitted that Supreme possessed the Kandahar warehouse. On June 4, 2013, DLA's Director, Vice Admiral replied, noting that ANHAM had not provided "any 'smoking guns' regarding seizures or any other alleged untoward behavior.'" Dkt. 14, 35.

On June 10, 2013, Defendant Orenstein sent an electronic communication to ANHAM's CEO advising that Supreme had indeed secured the Kandahar warehouse, that it was unaware of ANHAM's contract with the owner of the land upon which the Kandahar warehouse sat, and that local authorities intimated that the landowner could cancel its agreement for breach of contract. According to ANHAM, "[a]ll the underlying factual assertions in this e[lectronic mail message] were false." Dkt. 14, 35. Attached to Defendant Orenstein's electronic communication was what appeared to be an official report. Dkt. 14, 35.

On June 28, 2013, ANHAM's CEO responded to Defendant Orenstein's electronic mail message, identified the incorrect facts, and attached "a registered letter from the Afghanistan Ministry of the Interior documenting that the report [Defendant] Orenstein relied upon amounted to a fake report." Dkt. 14, 36.

On September 10, 2013, Supreme and ANHAM met separately with DLA's Director, Vice Admiral. ANHAM alleges that Defendants Orenstein and Supreme "again misrepresented or failed to disclose their role in the seizure of the Kandahar warehouse and their failure to engage in good-faith attempts to facilitate the transition." Dkt. 14, 36.

On September 19, 2013, DLA's Director, Vice Admiral demanded via electronic mail that Supreme and ANHAM cooperate and warned that DLA would not tolerate "meddling or intrusive actions" by Supreme. Dkt. 14, 37.

10

On September 25, 2013, DLA advised ANHAM that the Camp Star facility was an insufficient substitute for the Kandahar warehouse. And although ANHAM "offered a number of explanations for [its] loss [of the Kandahar warehouse] . . . , [] none of its proffered excuses absolve Anham[sic] of the requirement to maintain pallet positions required by the [new SPV] [C]ontract." Dkt. 14, 37.

ANHAM was unable to commence the new SPV Contract until November 19, 2013. Dkt. 14, 37.

ANHAM further advised that on August 1, 2013, the Afghanistan Ministry of the Interior indicated that neither it nor any state entity was involved in the seizure of the Kandahar warehouse and that what occurred was contrary to law. Accordingly, the Provincial Police Chief of Kandahar was instructed to return the Kandahar warehouse to ANHAM/its agent. Dkt. 14, 38.

On January 4, 2014, the Supreme Court of the Islamic Republic of Afghanistan, Appeal Courts Division of Kabul Province, issued an injunction in favor of ANHAM pending proceedings. The injunction was not enforced because Afghan Government Official B was tasked with its enforcement. Dkt. 14, 38.

B. Procedural Background

ANHAM and Plaintiff Relator ("Plaintiff Relators") filed their Complaint under seal on November 11, 2017. Dkt. 1. Plaintiff Relators amended their Complaint on September 14, 2018, asserting 13 counts against Defendants. Dkt. 14. After the United States Government investigated the matter and declined to intervene, the Complaint was ordered unsealed, and Plaintiff Realtors were directed to serve the Complaint on Defendants. Dkt. Nos. 18 and 19. After Plaintiff Relators

filed the Amended Complaint, that order was amended to reflect that the Amended Complaint was also ordered unsealed and directed to be served on the Defendants. Dkt. Nos. 19 and 25.[8]

Plaintiff Relators argue that but for the Defendants' conduct, ANHAM would have been able to commence performance on the new SPV Contract on December 22, 2012, at the conclusion of the six-month ramp-up period. This resulted in Supreme charging DLA rates that were 44% higher than those contained in the new SPV Contract, thereby costing DLA $933 million dollars. Dkt. 14, 37. ANHAM also lost $182 million in profits, $1.21 billion in revenue, and $20 million in costs for constructing the Kandahar warehouse. Dkt. 14, 37. Counts 1-10 implicate the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 (a), and Counts 10-13 concern Virginia state law claims only asserted by ANHAM.

Defendants Orenstein and Supreme filed a Motion to Dismiss pursuant to Fed. R. Civ. Pro. 12(b)(2) for lack of personal jurisdiction over Defendant Orenstein and pursuant to Fed. R. Civ. Pro. 12(b)(6) for failure to state a claim for which relief can be granted. Dkt. 52.

## II. Standard of Review

A 12(b)(2) motion attacks a complaint for lack of personal jurisdiction. Fed. R. Civ. P. 12(b)(2). The plaintiff bears the burden of establishing personal jurisdiction by a preponderance of the evidence. *D'Addario v. Geller*, 264 F.Supp.2d 367, 377 (E.D. Va. 2003) (citing *Mylan Labs, Inc. v. Akzo*, 2 F.3d 56, 59-60 (4th Cir. 1993)). A plaintiff is "entitled 'to favorable inferences from the pleadings, affidavits, and documents submitted on the issue.'" *Id.* (quoting *Reynolds Metals Co. v. FMALI, Inc.*, 862 F. Supp. 1496, 1498 (E.D. Va. 1994)).

---

[8] This case was reassigned from the Honorable T.S. Ellis, III, to the Honorable Rossie D. Alston, Jr., on July 11, 2019.

"To survive a 12(b)(6) motion, a complaint must contain sufficient factual matter accepted as true to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A claim is plausible on its face when "a plaintiff can demonstrate more than 'a sheer possibility that a defendant has acted unlawfully.'" *Rockville Cars, LLC v. City Rockville*, 891 F.3d 141, 145 (4th Cir. 2018) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The reviewing court accepts all well-pled facts as true and construes the facts in the light most favorable to the plaintiff. *Nemet Chrevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 681). However, "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement fail to constitute well-pled facts." *Id.* In addition, the Court "may consider documents attached to the complaint or the motion to dismiss so long as they are integral to the complaint and authentic." *Rockville Cars*, 891 F.3d at 145.

### III. Analysis

#### A. 12(b)(2)

The Court first considers whether it possesses personal jurisdiction over Defendant Orenstein.

Because the FCA authorizes nationwide service of process, 31 U.S.C. § 3732, "[w]here a defendant has been validly served pursuant to a federal statute's nationwide service of process provision, a district court has personal jurisdiction over the defendant so long as jurisdiction comports with the Fifth Amendment." *Trustees of the Plumbers and Pipefitters Nat. Pension Fund v. Plumbing Servs., Inc.*, 791 F.3d 436, 443 (4th Cir. 2015) (citing *ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617, 626-27 (4th Cir. 1997)). "To make out a Fifth Amendment challenge to personal jurisdiction, Defendants had to show that 'the district court's assertion of personal

jurisdiction over [them] would result in 'such extreme inconvenience or unfairness as would outweigh the congressionally articulated policy' evidenced by a nationwide service of process provision.'" *Id.* at 444 (quoting *Denny's, Inc. v. Cake*, 364 F.3d 521, 524 n. 2 (4th Cir. 2004)).

The Court notes that "Defendants fail to apply the correct rule of law, citing to the 'minimum contacts' standard we consider when assessing whether personal jurisdiction is consistent with the Due Process Clause of the Fourteenth Amendment." *Id.* (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) and *ALS Scan, Inc. v. Digital Service Consultants, Inc.*, 293 F.3d 707, 711 (2002)). "That standard, however, is not relevant when the basis for jurisdiction is found in a federal statute containing a nationwide service of process provision." *Id.*

Moreover, Defendants failed to establish their burden of showing extreme inconvenience or unfairness by use of federal nationwide service of process. Thus, Defendants "must look primarily to federal venue requirements for protection from onerous litigation." *Trustees*, 791 F.3d at 443 (quoting *ESAB Grp., Inc*, 126 F.3d at 627). The FCA venue statute provides that "[a]ny action under section 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred." 31 U.S.C. § 3732.

Because at least one of the defendants transacts business in this District, the Court finds that it possesses personal jurisdiction over Defendant Orenstein.

Accordingly, the Court denies the Motion as it pertains to 12(b)(2).

### B. 12(b)(6)

The FCA provides in pertinent part that

> [a]ny person who—(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval . . . [or] (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved

> by the Government . . . is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729 (a)(1)-(2).

"The FCA permits a private party to bring a *qui tam* action—an action in the name of the United States—against a person who violates its provisions." *Porch v. American K-9 Interdiction, LLC*, No. 2:12-cv-690, 2013 WL 4804285, at *9 (E.D. Va. 2013) (citing 31 U.S.C. § 3730(b)). In order to state a claim for which relief can be granted pursuant to the FCA, a plaintiff must allege:

> (1) that the defendant made a false statement or engaged in a fraudulent course of conduct; (2) such statement or conduct was made or carried out with the requisite scienter; (3) the statement or conduct was material; and (4) the statement or conduct caused the government to pay out money or to forfeit money due.

*U.S. ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 913 (4th Cir. 2003).

"[A]s an allegation of fraud, [a plaintiff] must comply with Rule 9(b)'s heightened pleading requirements," and state "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *U.S. ex rel. DRC, Inc. v. Custer Battles, LLC*, 472 F. Supp. 2d 787, 796 (E.D. Va. 2007) (quoting *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999)). However, the scienter element may be generally alleged. Fed. R. Civ. P. 9(b). Fed. R. Civ. P. 9(b) is intended to "ensure that the defendant has sufficient information to formulate a defense by putting it on notice of the conduct complained of," and "to eliminate fraud actions in which all the facts are learned after discovery." *Id.* (quoting *Harrison*, 176 F.3d at 784). Further,

> [a] court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts.

15

*Smith v. Clark/Smoot/Russell*, 796 F.3d 424, 432 (4th Cir. 2015) (quoting *Harrison*, 176 F.3d at 784).

In the instant matter, Plaintiff Relators assert various claims pursuant to the FCA under theories of fraudulent inducement and implied false certification. "'[L]iability for fraudulent inducement attaches to all claims 'submitted to the government under a contract when the contract or extension of government benefit was obtained originally through false statements or fraudulent conduct." *U.S. ex rel. DRC, Inc. v. Custer Battles, LLC*, 472 F. Supp. 2d 787, 797 (E.D. Va. 2007) (citing *Harrison*, 176 F.3d at 785). With respect to falsity, plaintiffs must furnish proof of an objective falsehood. *Id.* at 797 (citing *Hagood v. Sonoma Cty. Water Agency*, 81 F.3d 1465, 1477-78 (9th Cir. 1996)). With respect to the requisite scienter, the FCA defines "knowingly" to mean that a person has "(1) actual knowledge of the falsity; (2) deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." *Id.* (citing 31 U.S.C. § 3729(b)). In addition, "the requisite intent must be coupled with prompt, substantial nonperformance." *Id.* at 798 (quoting *U.S. ex rel. Willard v. Humana Health Plan of Tex. Inc.*, 336 F.3d 375, 386 (5th Cir. 2003)). With respect to materiality, "[t]he test for determining materiality is whether the false statement has a natural tendency to influence agency action or is capable of influencing agency action." *Id.* at 799-800 (quoting *Harrison*, 352 F.3d at 914, n. 4).

With respect to implied false certification, "when . . . a defendant makes representations in submitting a claim but omits its violations of statutory, regulatory, or contractual requirements, those omissions can be a basis for liability if they render the defendant's representations misleading with respect to the goods or services provided." *Universal Health Servs., Inc. v. United States*, 136 S.Ct. 1989, 1999 (2016) (quoting *United States ex rel. Berge v. Bd. of Trs. of the Univ.*

16

*of Ala.*, 104 F.3d 1453, 1460 (4th Cir.1997) (internal quotations omitted)). This theory can serve as a basis for liability where a Plaintiff Relator demonstrates "(i) that 'the claim does not merely request payment, but also makes specific representations about the goods or services provided,' and (ii) that 'the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths.'" *United States v. Academi Training Ctr., Inc.*, 220 F. Supp. 3d 676, 680 (E.D. Va. 2016) (quoting *Universal Health Services, Inc.*, 136 S.Ct. at 2001).

Reviewing the Amended Complaint in the light most favorable to Plaintiff Relators, the Court notes that the pleading standard for fraud claims is extraordinary, Fed. R. Civ. Pro. 9(b), and with respect to the FCA, the Court is not persuaded by the current permutation of the pleadings that Plaintiff Relators adequately pled the FCA claims, particularly with respect to elements "(3) the statement or conduct was material; and (4) the statement or conduct caused the government to pay out money or to forfeit money due." *Harrison*, 352 F.3d at 913.

While at this juncture, Plaintiff Relators' claims fail to meet the requisite standards, the Court declines to grant the Motion and thus provides Plaintiff Relators the opportunity to amend their Amended Complaint as it appears that amendment would not be necessarily or inevitably futile. *See In re PEC Sols., Inc. Sec. Litig.*, 418 F.3d 379, 391 (4th Cir. 2005) (citing *Forman v. Davis*, 371 U.S. 178, 182 (1962) (noting that "[l]eave to amend need not be given when amendment would be futile").

IV. Conclusion

The Court DENIES the 12(b)(2)-portion of the Motion because the Court possesses personal jurisdiction over Defendant Orenstein.

The Court DENIES the 12(b)(6)-portion of the Motion because the Court provides Plaintiff Relators the opportunity to AMEND the Amended Complaint.

It is SO ORDERED.

Alexandria, Virginia
January 8, 2020

/s/
Rossie D. Alston, Jr.
United States District Judge