IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

UNITED STATES OF AMERICA, *ex rel.*,  )
ANHAM FZCO and ASADULLAH             )
SADERKHAIL,                          )
                                     )
        Plaintiff-Relators,          )
                                     )        Civil Action: 1:17-cv-01290 (RDA/JFA)
    v.                               )
                                     )
SUPREME FOODSERVICE GmbH, *et al.*,  )
                                     )
        Defendants.                  )

## ORDER

This matter comes before the Court on Defendants' Motion to Dismiss the Second Amended Complaint ("Motion"). Dkt. 82. As argument would not aid in the decisional process, these matters are ripe for disposition. Accordingly, the Court will decide the Motion on the papers. Fed. R. Civ. P. 78 (b); Local Civil Rule 7(J). Considering the Second Amended Complaint, Dkt. 81, the Motion, Dkt. 82, the Response in Opposition, Dkt. 87, and the Reply, Dkt. 88, the Court GRANTS the Motion for the reasons stated below.

### I. Background

#### A. Factual Background

##### i. Contracts

Plaintiff-Relator ANHAM FZCO ("ANHAM") "is a global logistics services company and supply chain contractor formed under the laws of Dubai and the United Arab Emirates" with its principal place of business in Dubai. Dkt. 81, 4.

Defendant Supreme Foodservice GmbH ("Supreme") "is a privately held company formed under the laws of Switzerland" and maintains offices in Switzerland, the Netherlands, and the United States. Dkt. 81, 5.

According to the Second Amended Complaint, there is a Subsistence Prime Vendor ("SPV") program in Afghanistan through which the United States Government selects the prime contractor "responsible for providing subsistence food products to the United States military and other federally funded customers in Afghanistan." Dkt. 81, 1. Supreme served as the prime contractor under contract SPM300-05-D-3130, which commenced in June 2005 and ended on December 12, 2010. *Id.* at 9. That contract was extended through December 12, 2012, pursuant to a non-competitive bridge contract ("First Bridge Contract"). *Id.* This was done to allow the United States' Defense Logistics Agency, Troop Support ("DLA") to "solicit bids and award a new competitive contract" for these services and to enable "the new contractor time to prepare to commence deliveries." *Id.* "This Solicitation was intended to replace the SPV contract then in place with Supreme." *Id.* This was confirmed by the Justification and Approval document for the First Bridge Contract, which provided that "should a competitively awarded contract be put into place ahead of the projected timeline, [Supreme's] contract extension will be terminated . . . ." *Id.* at 11. "On April 26, 2011, DLA issued Solicitation No. SPM300-11-R0063, contemplating the award of a single indefinite-delivery/indefinite-quantity, fixed-price contract for the supply and delivery of food items to the [United States] military throughout various sites in Afghanistan." *Id.* at 9.

DLA received four proposals. *Id.* at 9. DLA determined that the two best proposals were submitted by Supreme and ANHAM. *Id.* "To compete for and ultimately win the [Solicitation], ANHAM [advised that it] had to design and build two [] warehouses in Afghanistan through which the storage, processing, and delivery of foodstuffs to the [United States] military troops, NATO

2

troops, and associated identified parties, would occur . . . ." *Id.* at 9-10. "[O]ne primary warehouse [was to be] in Bagram, Afghanistan to serve the northern portions of the country, and another in Kandahar, Afghanistan to serve the southern portions of the country." *Id.* at 10. So, in June 2011, ANHAM's agent, Afghan Fleet and Group Services, Inc. ("AFGS"), "entered into an Agreement and Bill of Sale with Afghan Meco Logistics Services ("MECO")." *Id.* at 10. As a result, "ANHAM acquired a 50% ownership interest and the right to build a warehouse on 48 Jeribs of land" in Kandahar and both the warehouse and improvements to that land were to sit "on portions of the tract owned 100% by ANHAM." *Id.* ANHAM began building the Kandahar warehouse immediately, ultimately costing ANHAM approximately $20 million. *Id.*

On June 11, 2012, a second Justification and Approval was issued "confirming that as soon as ANHAM could commence performance 'no additional orders will be placed against the [First B]ridge [C]ontract.'" *Id.* at 11. On June 19, 2012, DLA "extended Supreme's [First B]ridge [C]ontract . . . through December 12, 2013 ([] "Second Bridge Contract")" in order for potential bid protests to be adjudicated and anticipating other possible delays. *Id.* at 10-11. The Second Bridge Contract "was sole-source and terminable-at-will." *Id.* at 11.

Ultimately, DLA awarded Contract No. SPM300-12-D-3571 to ANHAM on June 22, 2012. *Id.* at 9-10, 12. Accordingly, ANHAM was to commence with its contractual duties beginning "on December 22, 2012 after a six month 'ramp up' period." *Id.* at 9. The ANHAM SPV Contract duration was 66 months with a potential value of more than $8 billion.

### ii. Bid Protests

Supreme filed two bid protests that triggered automatic statutory stays pursuant to 31 U.S.C. § 3553(d)(3). *Id.* at 12. On July 5, 2012, Supreme filed its first bid protest, after which DLA issued ANHAM a stop work order "that remained in place [from July 5, 2012,] until December 7, 2012." *Id.* at 12. On October 11, 2012, the Government Accountability Office

3

("GAO"), the entity tasked with evaluating bid protests, "partially sustained Supreme's first bid protest and recommended that DLA reevaluate the Experience/Past Performance factor consistent with the [S]olicitation evaluation criteria and determine whether that reevaluation altered the outcome of the award." *Id.* at 13. The reevaluation period began that day and continued until December 7, 2012. *Id.* at 14. On December 7, 2012, DLA re-awarded ANHAM's SPV Contract. *Id.*

Supreme filed a second bid protest on December 17, 2012. *Id.* at 22. In support of this bid protest, on October 26, 2012, Supreme allegedly "submitted a materially false and/or misleading letter to DLA." *Id.* at 14. In this letter, Supreme requested that DLA reevaluate "the responsibility determination DLA reached as to ANHAM's ability to perform the contract." *Id.* According to ANHAM, it was "[t]he unanimous opinion of the contracting officer and everyone he consulted [with] was that the allegations set forth in the [] [l]etter were not credible." *Id.* at 14-15. DLA initially declined to issue a stop work order for that reason. *Id.* at 22. Consequently, Supreme moved for declaratory and injunctive relief to enforce the statutory stay, which the Court of Federal Claims granted on February 19, 2013. *Id.* Accordingly, on February 20, 2013, DLA issued a second stop work order which continued until March 27, 2013. *Id.* at 12. On March 27, 2013, the bid protest was denied, and the stop work order was lifted. *Id.* at 26.

### iii. Defendants' Conduct

In "the middle of 2012," an attorney for Supreme and corporate officer, Soren Borup Norgaard, and Chief Executive and principal owner of SAK, Haji Obaidullah Sader Khail ("CE of SAK"), discussed "what could be done to interfere with ANHAM's business activities and how to take control of ANHAM's Kandahar warehouse." *Id.* at 15. Plaintiff-Relator Asadullah Saderkhail ("Plaintiff-Relator Saderkhail") overheard these discussions. *Id.* He was physically present "in an office adjacent to the location of these weekly meetings," separated only by a "half-

4

height class partition wall structure." *Id.* Plaintiff-Relator Saderkhail detailed that the discussions concerned "preventing ANHAM from initiating performance of its Afghanistan SPV [C]ontract," and became more targeted, focusing on how "SAK and Supreme could take control of ANHAM's Kandahar warehouse." *Id.* At some of these meetings, Chief Executive Officer of Supreme, Stephen Orenstein ("CEO of Supreme"), voiced his agreement that "obtaining control over ANHAM's Kandahar warehouse was the course of action they would carry out to derail ANHAM's ability to commence performance of [ANHAM's] SPV [C]ontract." *Id.* at 15.

At some point before November 10, 2012, the owner of MECO, Mohammad Anwar Abdulwahid ("CEO of MECO"), according to Plaintiff-Relators, "was fraudulently induced by agents of Supreme and SAK to breach the June 2011 Agreement and Bill of Sale." *Id.* at 15-16. Plaintiff-Relators contended that SAK and Supreme did so by "falsely alleging to MECO that the governments of the United States and Afghanistan would not permit ANHAM to perform the [ANHAM] SPV [C]ontract, and by falsely alleging that ANHAM would not be able to utilize MECO for any services under the [ANHAM] SPV Contract." *Id.* at 17. The CEO of MECO was also allegedly told that MECO would "become a Supreme Contractor." *Id.* at 24.

On November 10, 2012, the CEO of MECO was brought to Dubai where he and the CE of SAK executed a Commercial Lease Agreement and Asset Purchase Agreement. *Id.* at 16. The following were present: Afghan Government Official B, Supreme's attorney Charles Jackson, Norgaard, Sayed Sultanag, and Plaintiff-Relator Saderkhail. *Id.*

Plaintiff-Relators contend that SAK acted on Supreme's behalf in executing the Commercial Lease Agreement and Asset Purchase Agreement. On November 14, 2012, a $20 million UBS bank guarantee issued against a Supreme account allegedly in consideration of that agreement. *Id.* at 16. Plaintiff-Relators support their position by referencing "[t]he payment guarantee letter, Reference No. 30GA-E6398107J1H, [which] identified SAK as the debtor and

MECO/Haji Anwar as the beneficiaries." *Id.* Supreme "ultimately transferred nearly $16.8 million to SAK without entering into a written agreement." *Id.* at 16, 24 (noting that Supreme initiated a wire transfer to SAK in the amount of $16,781,600, allegedly covering the purchase of the Kandahar warehouse and payment to SAK for its assistance). This figure also included Supreme's agreement to make "future payments of $3 million annually to MECO during the first two years of possession." *Id.* at 17. Additionally, Plaintiff-Relators contend that MECO decided not to terminate the June 2011 Agreement and Bill of Sale between ANHAM/AFGS and MECO because MECO knew these allegations that ANHAM was in breach were false. *Id.* at 18. Also, the CE of SAK and Norgaard discussed via email a third-party proposal regarding surveying the Kandahar warehouse which provided that MECO was the "Seller" and SAK was the "Buyer" of the Kandahar warehouse site and indicated that the third party was to be paid AED 110,000 "as a mobilization fee." *Id.* at 19. The CEO of MECO and the CE of SAK later agreed to accept the proposal and divide the mobilization fee evenly. *Id.* at 21.

On November 21, 2012, an employee of Supreme notified the CE of SAK "that Supreme would be deploying a team to the Kandahar site to inventory the Kandahar warehouse and assume control over security." *Id.* at 19.

Ernie Pallett, Supreme's Director of Security—Corporate and Legal Affairs ("Supreme's Director of Security"), emailed Syed Sultanag, a "businessman who had dealings with SAK and MECO" who also worked with Afghan Government Officials A and B in effecting the seizure of the Kandahar warehouse.[1] *Id.* at 19-20. Supreme's Director of Security advised that, ideally, their staff would be "at the site tomorrow" and two vehicles with armed guards and another vehicle

---

[1] Their identities are known to Defendants as well as the United States Government. *Id.* at 19. Plaintiff-Relators contend that these individuals are "known to have engaged in extrajudicial killings, forced disappearances and torture, such that their identities are omitted from this Second Amended Complaint" for security purposes. *Id.* at 19-20.

would be deployed. *Id*. at 19.  He further advised that the CE of SAK would have his security staff there as well. *Id*. at 19.

On November 23, 2012, the Kandahar warehouse was seized "by an armed militia." *Id*. at 21.  Neither ANHAM nor AFGS were given prior notice. *Id*. at 19.  Afghan Government Officials A and B were allegedly paid to assist in the seizure of the Kandahar warehouse. *Id*. at 20.  Afghan Government Official A received approximately $300,000 from Supreme as well as a cash deposit of AED 367,000—the equivalent to $100,000.  Plaintiff Relator Saderkhail "was directed [by CE of SAK] to deposit cash into a bank account held in the name of [Afghan] Government Official A." *Id*.  Other payments to this official included payment for family travel. *Id*.  Afghan Government Official B was paid for his assistance with the Kandahar warehouse and for witnessing the execution of the Asset Purchase Agreement and Commercial Lease by being placed on SAK's payroll. *Id*. at 20-21.  Afghan Government Official B was paid about AED 7,000 per month, which amounts to about $1,700 per month. *Id*.

Then, in December 2012, Afghan Government Official A travelled to the United States. *Id*. at 22.  Norgaard and the CE of SAK visited that official to retain his "continued assistance" in maintaining control over the Kandahar warehouse.

On December 29, 2012, SAK and Afghan Government Official B executed an addendum to the Asset Purchase Agreement; Charles Jackson, one of Supreme's attorneys, served as a witness. *Id*. at 24.  The addendum made clear that SAK "purchased the Kandahar warehouse from MECO and Jai Anwar for $16.2 million." *Id*.

In 2015, SAK and Supreme executed an Asset Purchase Agreement, which provided that SAK would transfer the Kandahar property to Supreme. *Id*.  ANHAM contends that ultimately, SAK "had no stake" in the Kandahar property and acted "only" on Supreme's behalf. *Id*. at 24.  This is due in part to an email exchange between the CE of SAK and Norgaard wherein the CE of

7

SAK expressed that SAK had "no benefit [from] these contracts from beginning . . . till today [sic]." *Id.* at 37. The transfer was set to occur on February 2, 2015. *Id.*

Plaintiff-Relators also allege that the Kandahar warehouse was never actually utilized after the seizure. On January 8, 2013, the CEO of MECO was advised that MECO had "been awarded transportation contract No. SUP-2012-0013, effective January 15, 2013[.]" *Id.* at 25. That contract provided "for fixed payments for each delivery MECO made from the Kandahar warehouse to various destinations throughout Afghanistan." *Id.* However, "no work took place under that subcontract." *Id.* Further, only after "third parties began questioning the absence of any commercial activities there" did Supreme begin storing water at the Kandahar warehouse. *Id.* "Much of the Kandahar warehouse complex was dismantled and sold off." *Id.* It is further alleged that Norgaard met with the CE of SAK in either Washington, D.C. or Virginia regarding the seizure and control of the Kandahar warehouse. *Id.* at 26.

### iv. ANHAM's Response

ANHAM eventually became aware of what occurred with the Kandahar warehouse and filed a petition with the National Assembly of Afghanistan's Petitions and Complaints Committee seeking redress. *Id.* at 26. In a written response issued on December 27, 2012, the Ministry of the Interior advised that a site visit would be conducted for further investigation. *Id.* at 26-27.

On January 16, 2013, ANHAM, through Beau Lendman, one of ANHAM's Senior Vice Presidents ("ANHAM SVP"), subsequently reported to DLA via email what it knew about the seizure of the Kandahar warehouse. *Id.* at 28. That communication advised that an armed private militia occupied the Kandahar warehouse, preventing ANHAM from utilizing it. *Id.* Additionally, ANHAM indicated that it had initiated the legal proceedings mentioned above and noted that it "expected to have control of its warehouse [] prior to mobilizing under the ANHAM SPV Contract." *Id.* ANHAM further disclosed that it "had been advised that the militia reported to an

8

individual who served as a primary subcontractor under one of Supreme's fuel delivery contracts." *Id.*

On January 17, 2013, DLA sent four follow-up questions to ANHAM regarding the contents of the previous communication. *Id.* DLA also advised that before ANHAM could commence "the implementation phase of the ANHAM SPV Contract[,] ANHAM had to have all infrastructures completed at both its Bagram and Kandahar facilities." *Id.*

On January 23, 2013, ANHAM responded, through an ANHAM SVP. *Id.* At that time, ANHAM "remained mostly in the dark about what had transpired" but "explained that the militia occupying the Kandahar warehouse site threatened armed conflict should ANHAM attempt" to reenter. *Id.*

On January 31, 2013, Dennis Strolle, DLA's Contracting Officer, emailed ANHAM noting that pursuant to the ANHAM SPV Contract, "all infrastructures shall be completed at [the] Kandahar facility. . . by March 7, 2013." *Id.* at 29.

The next day, DLA required ANHAM to respond in writing how ANHAM could commence with the ANHAM SPV Contract if the Kandahar warehouse was inaccessible. *Id.* at 29. On February 4, 2013, ANHAM responded with a plan assuming ANHAM was able to regain control over the Kandahar warehouse. *Id.*

Then, on February 12, 2013, ANHAM sent a letter to Chief Counsel of DLA, advising that the Afghan Government was conducting a criminal investigation into the seizure of the Kandahar warehouse. *Id.* The letter documented ANHAM's belief that Supreme "ha[d] been involve[d] in financing, and/or otherwise engineering, the seizure to force the extension of Supreme's current prime vendor contract." *Id.* Attached to the letter was "a list of Afghan officials and private citizens ANHAM believed had information relevant to the allegations and would cooperate with U.S. officials." *Id.*

9

Additionally, ANHAM's subcontractor, AFGS, emailed a letter to the Afghan Investment Support Agency ("AISA") regarding the seizure of the Kandahar warehouse. *Id.* AFGS advised that ANHAM had information that "our land and improvements were purportedly and illegally sold to one Haji Obaidullauh Sarder [sic] Khail[,] . . . a primary subcontractor to Supreme Food Service, GmbH." *Id.* AFGS also stated that "the purported illegal seizure and sale were at the behest and planning of Supreme. . . in order to seek an illegal competitive advantage regarding certain U.S. Government Contracts that have been award[ed] to ANHAM." *Id.* at 30.

On April 6, 2013, ANHAM, through its Chief Operating Officer, Jay Ward, emailed Captain of DLA Michael Hansen expressing concern about ANHAM being able to regain control over the Kandahar warehouse in time. *Id.* at 30. ANHAM, through an ANHAM SVP, followed up under the impression that being unable to use the Kandahar facility was not detrimental to the commencement of ANHAM's SPV Contract. *Id.* ANHAM proposed modifications to ANHAM's SPV Contract, including building another warehouse at Camp Star and increasing capacity at ANHAM's Bagram warehouse. *Id.*

ANHAM constructed a warehouse at Camp Star, which cost approximately $10 million. *Id.* at 30. Even with the construction of Camp Star, ANHAM was unable to "mak[e] deliveries to southern Afghanistan locations" as required pursuant to ANHAM's SPV Contract. Thus, this "necessarily delayed and reduced ANHAM's performance under the ANHAM SPV Contract." *Id.*

v. Supreme's Reply

ANHAM's communications prompted DLA to question Supreme. *Id.* at 31. On January 16, 2013, Supreme responded. Plaintiff-Relators contend that "Supreme misrepresented or failed to disclose its role in the Kandahar warehouse seizure and the delay of ANHAM's ability to perform the ANHAM SPV Contract." *Id.* at 31.

On May 24, 2013, DLA met separately with ANHAM and Supreme. *Id.* Prior to that meeting, DLA's Director, Vice Admiral Mark Harnitcheck ("Director of DLA"), circulated an agenda noting that a topic to be discussed included the transition of the SPV contract to ANHAM as well as "[w]ork details and critical tasks for ANHAM to assume full capability for the SPV contract mission by Dec[.] 2013." *Id.* at 31. On May 28, 2013, the Director of DLA sent a summary communication to Orenstein and ANHAM's Chief Executive Officer, A. Huda Farouki ("CEO of ANHAM"). *Id.* The Director of DLA further noted that "both companies have some form of claim of ownership" over the Kandahar warehouse and that he would not tolerate "meddling or intrusive actions." *Id.* Supreme represented that it was assisting with the "smooth transition." *Id.* at 32. From that, ANHAM gathered that Supreme did not disclose its role in the seizure of the Kandahar warehouse but denied its involvement, thereby allegedly making misrepresentations. *Id.* at 31. Supreme also failed to disclose that it was attempting to "prevent[] the transition of [ANHAM's] SPV [C]ontract through espionage at the Bagram warehouse." *Id.*

DLA, through Lourdes Valentin, emailed ANHAM for documentation substantiating what occurred at the Kandahar warehouse and requested particular details. *Id.* at 32. ANHAM provided the following four documents on June 3, 2013: a complaint ANHAM submitted to the Afghan Parliament, responses from both houses of parliament "confirming that an investigation would take place," ANHAM's complaint to AISA, and the Afghan Public Protection Force's findings. *Id.*

Also, on June 3, 2013, the CEO of ANHAM met with Orenstein. *Id.* Orenstein admitted "that Supreme had obtained ownership of the Kandahar warehouse . . . to meet Supreme's legitimate business needs." *Id.* Therefore, ANHAM, through CEO of ANHAM, emailed DLA, through the Director of DLA, about Supreme's admissions. *Id.* ANHAM also undercut Supreme's

reasoning by noting that "Supreme was in the process of closing numerous warehouses throughout the country." *Id.*

The Director of DLA responded by emailing the CEO of ANHAM. *Id.* While characterizing Supreme's purchase of additional warehouse space as "odd," the Director of DLA noted that ANHAM did not provide "any 'smoking guns' regarding seizures or any other alleged untoward behavior." *Id.* at 32-33.

On June 10, 2013, Orenstein acknowledged in an email that Supreme had "secured the use of the Kandahar warehouse for its own use," but was allegedly unaware of ANHAM's prior contractual relationship with the landowner, and asserted that Supreme believed that the "landowner was entitled to cancel the arrangements with ANHAM/AFGS for breach of contract." *Id.* at 33. Orenstein attached a document to the email, which he claimed was an official government report. *Id.*

On June 28, 2013, the CEO of ANHAM responded that the factual assertions in the email were false and that the report was fake. *Id.* at 34. ANHAM attached a registered letter from the Afghanistan Ministry of the Interior stating that the report was "not on file with the Ministry of the Interior" and noted that the "government report" lacked credibility. *Id.*

On September 10, 2013, the Director of DLA again held separate meetings with Supreme, through Orenstein, and ANHAM. *Id.* ANHAM again maintained that Orenstein and Supreme "misrepresented or failed to disclose their role in the seizure of the Kandahar warehouse and that they, in general, never intended to facilitate the transition." *Id.*

On September 19, 2013, the day that the Court of Federal Claims rejected Supreme's second bid protest, the Director of DLA emailed Supreme and ANHAM demanding cooperation and reiterating that "meddling or intrusive actions" would not be tolerated. *Id.*

On September 25, 2013, DLA notified ANHAM by letter that the Camp Star facility failed to satisfy the terms of ANHAM's SPV Contract. *Id.* at 35. None of the "proffered excuses absolve[d] A[NHAM] [sic] of the requirement to maintain pallet positions required by [ANHAM's SPV] [C]ontract." *Id.* at 35. The letter also displayed DLA's disbelief of ANHAM's allegations regarding Supreme's plan to delay the commencement of ANHAM's SPV Contract, including its participation in the seizure of the Kandahar warehouse. *Id.*

Accordingly, the commencement of ANHAM's SPV Contract was delayed from December 22, 2012, until November 19, 2013. *Id.* ANHAM argues that during this time "[t]he claims Supreme submitted [to the United States Government pursuant to the Second Bridge Contract] were false and contained material omissions." *Id.* ANHAM contended that this was so "because Supreme's contractual relationship with the [United States] Government would have terminated on December 22, 2012 if Defendants had not engaged in the fraudulent course of conduct described." *Id.* at 35-36. Absent "the fraudulent course of conduct, Supreme would not have been entitled to any payments from the [United States] Government during this period." *Id.* at 36. As there were no other viable contractors who could meet the demands of the ANHAM SPV Contract, Plaintiff-Realtors allege that the United States Government "was forced to continue mak[ing] payments to Supreme to purchase the necessary food products until ANHAM could commence performance." *Id.* As a result, the United States Government was, in Plaintiff-Relator's view, overcharged "by at least $933 million" considering that Supreme charged rates that were 44% higher than ANHAM's. *Id.* ANHAM itself contended that it sustained lost revenues in the amount of $1.21 billion, lost profits of about $182 million, and $20 million in constructing the Kandahar warehouse. *Id.*

vi. Investigation of Seizure of Kandahar Warehouse

13

On August 1, 2013, according to Plaintiff-Relators, the Afghanistan Ministry of the Interior responded to certain questions posed by ANHAM. *Id.* The Afghanistan Ministry of the Interior replied that no state action was involved in the seizure of the Kandahar warehouse, and that "staff and labourers were expelled forcibly by armed persons belonging to Haji Obaidulla [Sader Khail]" which was contrary to law. *Id.* Further, those who participated in the seizure had "no legal responsibility or license to provide security to private companies." *Id.* In addition, the Provincial Police Chief of Kandahar was directed to return the Kandahar warehouse and underlying land to ANHAM/AFGS. *Id.*

ANHAM also moved the Supreme Court of the Islamic Republic of Afghanistan, Appeal Courts Division of Kabul Province, for an injunction. *Id.* at 27. In its motion, ANHAM requested that "all the installations, buildings, cold storage warehouses, appliances, equipment, and construction material, which are subject to dispute...be taken out of the control of current occupiers [Supreme]...[and] after the conclusion of the lawsuit, they may be transferred to their rightful owner [ANHAM]." *Id.* An injunction was issued by the Supreme Court of the Islamic Republic of Afghanistan, Appeal Courts Division of Kabul Province, on January 4, 2014. *Id.* at 27 and 36. However, because Afghan Government Official B was responsible for enforcing the injunction, it was not actually enforced. *Id.*

ANHAM "did not obtain actual knowledge of the fraudulent scheme . . . until on or after May 2015 when [Plaintiff-]Relator Saderkhail came forward." *Id.* at 38. Additionally, that same month, ANHAM obtained photographs showing that the Kandahar warehouse was used to store a small amount of water and empty shipping containers. *Id.* Further, Plaintiff-Relators alleged that the United States Government lacked actual knowledge of this "underlying fraud scheme because Supreme withheld its role in the seizure of the Kandahar warehouse and affirmatively misled the [United States] Government." *Id.*

14

B. Procedural Background

Accordingly, on November 14, 2017, Plaintiff-Relators filed a *qui tam* action on behalf of the United States under seal. Dkt. 1.

An Amended Complaint was filed on September 14, 2018. Dkt. 14. The Government filed a notice that it declined to intervene in this matter on November 21, 2018. Dkt. 18. Consequently, both the Complaint and Amended Complaint were unsealed and were served on Defendants. Dkt. Nos. 19. and 25. Certain Defendants, Orenstein and Supreme, filed a Motion to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(b)(2). Dkt. 52. On November 22, 2019, Plaintiff-Relators filed a Memorandum in Opposition. Dkt. 59. Those Defendants filed a Reply on December 13, 2019. Dkt. 61. On January 8, 2020, the Court denied the Motion to Dismiss made pursuant to 12(b)(2). Dkt. 77. The Court also denied the Motion to Dismiss made pursuant to 12(b)(6) but permitted Plaintiff-Relators to file a Second Amended Complaint to cure those deficiencies. *Id.*

Plaintiff-Relators filed a Second Amended Complaint on January 22, 2020. Dkt. 81. In this Second Amended Complaint, Plaintiff-Relators seek "to recover damages and civil penalties arising from the actions of Defendants . . . in conspiring to perpetrate a fraudulent scheme by which Supreme and the other named [D]efendants intentionally delayed implementation of [ANHAM's SPV C]ontract." *Id.* at 1. Plaintiff-Relators alleged that the "intended purpose and result" of this scheme "was to induce the [United States] Government to continue payments to Supreme under its [Second B]ridge [C]ontract[], at prices exceeding competitive market prices by at least 44%." *Id.* at 2. Moreover, Plaintiff-Realtors contend that Supreme and the other Defendants did this to ensure that DLA would continue paying Supreme "after the point in time when the [United States] Government would have terminated the bridge contract either absent the fraud or had Supreme disclosed the fraud, as it was required to do by the operative contract." *Id.*

Plaintiff-Relators assert 12 claims against Defendants:  that (1) Defendants violated 31 U.S.C. § 3729(a)(1)(A) by knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval; (2) Defendants violated 31 U.S.C. § 3729 (a)(1)(B) by knowingly making, creating, or using false records or statements to submit or cause to be submitted false claims; (3) Defendants violated 31 U.S.C. § 3729(a)(1)(C) for conspiring to violate the False Claims Act ("FCA"); (4) Defendants violated 31 U.S.C. § 3729(a)(1)(A) for making implied false certifications with respect to 48 C.F.R. § 9.104; (5) Defendants violated 31 U.S.C. § 3729 (a)(1)(A) for making implied false certifications with respect to the second bid protest and related statutory stay; (6) Defendants violated 31 U.S.C. § 3729 (a)(1)(A) for making implied false certifications with respect to 48 C.F.R. § 52.203-13; (7) Defendants violated 31 U.S.C. § 3729 (a)(1)(A) for making implied false certifications regarding 48 C.F.R. § 52.203-7; (8) Defendants violated 31 U.S.C. § 3729 (a) for making implied false certifications under the prevention doctrine; (9) Defendants violated Va. Code Ann. §§ 18.2-499 and 500 for conspiracy to commit fraud; (10) Defendants tortiously interfered with an existing or prospective contract; (11) Defendants tortiously interfered with business relations; and (12) Defendants converted ANHAM's property. Dkt. 81, 38-60.

On February 5, 2020, certain Defendants, Orenstein and Supreme, filed a Motion to Dismiss Plaintiff-Relators' Second Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  Dkt. 82.  Plaintiff-Relators filed a Brief in Opposition on February 26, 2020. Dkt. Nos. 85, 86, and 87.  And those Defendants replied on March 10, 2020.  Dkt. 88.

## II. Standard of Review

In considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), "'the material allegations of the complaint are taken as admitted,' and 'the complaint is to be liberally construed in favor of plaintiff.'" *Berry v. Gutierrez*, 587 F. Supp. 2d 717, 721 (E.D. Va.

2008) (quoting *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969)).  To survive a 12(b)(6) motion, the complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  *Id.* (quoting Fed. R. Civ. P. 8).   Additionally, "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "A claim has facial plausibility when the plaintiff pleads factual content that allows [a] court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  This Court also "will not accept 'legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments.'"  *United States ex rel. Nathan v. Takeda Pharm. North Am., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013) (quoting *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012)).

In addition to this general pleading standard, "fraud-based claims must satisfy Rule 9(b)'s heightened pleading standard."  *United States ex rel. Grant v. United Airlines, Inc.*, 912 F.3d 190, 196 (4th Cir. 2018) (citing *Nathan*, 707 F.3d 451 at 455-56).  "Rule 9(b) requires that 'a party must state with particularity the circumstances constituting fraud or mistake.'"  *Id.* (quoting Fed. R. Civ. P. 9(b)).  "FCA claims sound in fraud and, therefore, the Court of Appeals for the Fourth Circuit has 'adhered firmly to the strictures of Rule 9(b) in applying its terms to cases brought under the Act.'"  *United States ex rel. Hagood v. Riverside Healthcare Ass'n, Inc.*, No. 4:11-cv-109, 2015 WL 1349982, at *6 (E.D. Va. Mar. 23, 2015) (quoting *Nathan*, 707 F.3d at 456).  This is so given the "multiple purposes of Rule 9(b)":

> namely, of providing notice to a defendant of its alleged misconduct, of preventing frivolous suits, of "eliminat[ing] fraud actions in which all the facts are learned after discovery," and of "protect[ing] defendants from harm to their goodwill and reputation," are as applicable in cases brought under the Act as they are in other fraud cases.

*Id.* (quoting *Nathan*, 707 F.3d at 456).

17

Further, "[a] plaintiff's failure to plead fraud with particularity under Rule 9(b)'s pleading requirements 'is treated as a failure to state a claim under Rule 12(b)(6).'" *Id.* (quoting *Harrison v. Westinghouse Savanna River Co.*, 176 F.3d 776, 783 n.5 (4th Cir. 1999)).

### III. Analysis

### A. False Claims Act

"The FCA protects the [United States G]overnment against false claims that are presented to it in federal contracts." *Grant*, 912 F.3d at 196. "All FCA claims require, among other elements, that the false statement or conduct 'caused the [United States G]overnment to pay out money or to forfeit money due.'" *Id.* (quoting *United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 913 (4th Cir. 2003) (*Harrison II*)).

Section 3729(a)(1)(A) of the FCA prohibits any person from "knowingly present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). Section 3729(a)(1)(B) of the FCA prohibits any person from "knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to a false or fraudulent claim." And section 3729(a)(1)(C) prohibits any person from "conspir[ing] to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G)."

It is important to note that "[t]he Supreme Court has cautioned that the [FCA] was not designed to punish every type of fraud committed upon the [United States G]overnment." *Harrison*, 176 F.3d at 785 (citing *United States v. McNinch*, 356 U.S. 595, 599 (1958)). "In order for a false statement to be actionable under either subsection . . . , it must be made as part of a false or fraudulent claim." *Grant*, 912 F.3d at 196 (citing *Harrison*, 176 F.3d at 786 ("The statute attaches liability not to the underlying fraudulent activity or to the government's wrongful payment, but to the 'claim for payment.'") (alterations omitted)). "A 'claim' is 'any request or

18

demand, whether under a contract or otherwise for money or property that . . . is presented to an officer, employee, or agent of the United States." *Id.* (quoting 31 U.S.C. §§ 3729(b)(2)(A) & (A)(i)). "Therefore, a central question in all FCA cases is whether the defendant ever presented a false or fraudulent claim to the [United States G]overnment, resulting in a 'call upon the government fisc.'" *Id.* (quoting *Harrison*, 176 F.3d 785-86).

"To prove an FCA claim, [Plaintiff-Relators] must demonstrate [that]: (1) 'there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the [United States G]overnment to pay out money or to forfeit moneys due (i.e., that involved a 'claim')." *United States ex rel. McLain v. KBR, Inc.*, No. 1:08-cv-499, 2013 WL 710900, at *5 (E.D. Va. Feb. 27, 2013) (quoting *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376 (4th Cir. 2008)).

Additionally, as previously noted, *supra*, p. 17, Plaintiff-Relators must plead their claims with particularity pursuant to Rule 9(b). To do so, Plaintiff-Relators "must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.'" *Hagood*, 2015 WL 1349982 at *7 (quoting *United States ex rel. Ahumada v. NISH*, 756 F.3d 268, 280 (4th Cir. 2014)). "More precisely, the complaint must allege 'the who, what, when, where and how of the alleged fraud.'" *Id.* (quoting *Ahumada*, 756 F.3d at 280). As the Fourth Circuit has held, "Rule 9(b) requires that 'some indicia of reliability' must be provided in the complaint to support the allegation that an actual false claim was presented to the government." *Id.* (quoting *Nathan*, 707 F.3d at 456-57). "Therefore, 'when a defendant's actions, as alleged and as reasonably inferred from the allegations, could have led, but need not necessarily have led, to the submission of false claims, a [Plaintiff-R]elator must allege with particularity that specific false claims actually were presented to the [United States G]overnment for payment.'" *Id.* (quoting *Nathan*, 707 F.3d at 457) (emphasis

in original).   "However, the Fourth Circuit has suggested that, even in the absence of 'particularized allegations of false claims,' a plaintiff can satisfy Rule 9(b)'s strictures where the 'specific allegations of the defendant's fraudulent conduct necessarily le[d] to the plausible inference that false claims were presented to the [United States G]overnment.'"   *Id.* (quoting *Nathan*, 707 F.3d at 457).

FCA claims may also be presented under the false certification theory, wherein "a defendant makes representations in submitting a claim but omits its violations of statutory, regulatory, or contractual requirements, [and] those omissions can be a basis for liability if they render the defendant's representations misleading with respect to the goods or services provided." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1999 (2016).   To meet that standard, the following conditions must be satisfied: "first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." *Id.* at 2001.   The Supreme Court targeted "omissions that 'fall squarely within the rule that half-truths— representations that state the truth only so far as it goes, while omitting critical qualifying information—can be actionable misrepresentations.'" *United States v. Triple Canopy, Inc.*, 857 F.3d 174, 178 (4th Cir. 2017) (quoting *Escobar*, 136 S. Ct. at 2000).

## B. Counts 1-9: 12(b)(6) Standard

### i. Alleged Fraudulent Scheme or Course of Conduct Theory

Defendants assert that the allegations surrounding the fraudulent conduct were insufficiently pled because they were conclusory. Dkt. 84 at 18 (citing *Twombly*, 550 U.S. at 555, 557).   Defendants also take issue with respect to Plaintiff-Relators' characterization of DLA's payments to Supreme as constituting fraudulent charges or overcharges as the Second Bridge

Contract was allegedly kept in place due to Defendants' conduct, and the rates Supreme charged were 44% higher than ANHAM's.  Dkt. 84, 20-22.

Plaintiff-Relators respond that Defendants presented false statements to DLA by failing to disclose their scheme involving the Kandahar warehouse, allegedly undertaken to delay the commencement of ANHAM's SPV Contract, and by misrepresenting what occurred to DLA. Dkt. 87, 24.

Defendants further contend in their Reply that there is not a sufficient nexus between the alleged false statement and DLA's decision to award and continue paying Supreme under the Second Bridge Contract and that the alleged false statements made at the May and September 2013 meetings lack the requisite specificity. Dkt. 88, 10-11.

The Court observes that to satisfy the presentment element for an FCA claim, "the statement or conduct alleged must represent an objective falsehood." *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376 (4th Cir. 2008) (citing *United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1018 (7th Cir. 1999)).  "'[I]mprecise statements or differences in interpretation growing out of a disputed legal question are similarly not false under the FCA.'"  *Id.* (quoting *Lamers*, 168 F.3d at 1018).

The Court first finds that these claims fail to meet the 12(b)(6) standard as they do not represent objective falsehoods.

"As *Harrison* [] indicated, FCA claims center on the presentation of a fraudulent claim for payment, not simply an engagement in some fraudulent conduct." *McLain*, 2013 WL 710900, at *5 (citing *Harrison*, 176 F.3d at 785).  Plaintiff-Relators allege that Defendants arguably engaged in fraudulent conduct.  According to the Second Amended Complaint, several Defendants discussed seizing the Kandahar warehouse as a means to delay ANHAM from commencing with its ANHAM SPV Contract at the conclusion of the "ramp up" period.  The CEO of MECO and

the CE of SAK executed a Commercial Lease Agreement and Asset Purchase Agreement regarding the Kandahar warehouse, which was then "seized." This, in turn, resulted in DLA continuing to submit payments to Supreme under the Second Bridge Contract. Plaintiff-Relators further allege that Supreme failed to disclose its involvement or the extent of its involvement to DLA in various meetings. Plaintiff-Relators also contend that Supreme did so via written documents, including a letter supporting its second bid protest and a letter seemingly from the Afghanistan Ministry of the Interior.

This Court need not accept Plaintiff-Relators' conclusory assertions that Supreme presented fraudulent claims for payment to DLA as a result of Defendants' allegedly fraudulent conduct. Considering the Second Amended Complaint, the Court first notes that DLA and Supreme executed the Second Bridge Contract on June 19, 2012, set to expire on December 12, 2013, in order for potential bid protests to be adjudicated and anticipating other possible delays. Dkt. 81, 10-11. This occurred prior to any of the alleged fraudulent conduct, in anticipation that there would be delays with the commencement of ANHAM's SPV Contract. Dkt. 81, 10-11. Further, at that time, DLA and Supreme agreed to payment rates.

Additionally, from the allegations contained in the Second Amended Complaint, it appears that Defendants may well have had a legitimate property interest in the Kandahar warehouse and the land upon which it sat, considering the agreement executed by MECO and SAK as well as the subsequent transfer of the Kandahar warehouse and underlying land to Supreme. The Director of DLA himself noted that "both companies have some form of claim of ownership" over the Kandahar warehouse. Dkt. 81, 31. Further, ANHAM first expressed its suspicions regarding Supreme's involvement in the allegedly improper seizure of the Kandahar warehouse to DLA, on January 16, 2013. Dkt. 81, 28. Nevertheless, DLA continued to pay Supreme pursuant to the Second Bridge Contract.

22

The Court also recognizes that ANHAM and Supreme competed for the Solicitation, which ANHAM won.  This understanding provides insight into how Plaintiff-Relators have characterized certain previously-mentioned transactions.

While the allegations contained in the Second Amended Complaint at best permit the Court to reasonably infer that Defendants engaged in a fraudulent scheme, they do not "necessarily lead to the plausible inference" that false claims were actually presented to the United States Government because of such alleged fraudulent scheme.  *Nathan*, 707 F.3d at 457.  Therefore, this Court cannot conclude that Supreme actually presented fraudulent claims for payment to the United States Government, which is a "central question" in all FCA cases.  *Harrison*, 176 F.3d at 785.  Further, recognizing that Supreme may well have a property interest in the Kandahar warehouse and underlying property, the Court also cannot conclude that the claims contained objective falsehoods.  *Wilson*, 525 F.3d at 376.

### ii. Alleged Implied Certification Theory

Defendants also argue that all claims predicated on the implied certification theory fail to meet both prongs of the two-part test set forth by the Supreme Court of the United States in *Escobar*.  Dkt. 84, 22-23 (citing *Escobar*, 136 S. Ct. at 2001).  Defendants assert that Plaintiff-Relators do not connect Defendants' alleged failure to disclose conduct connected with the Kandahar warehouse to "representations in Supreme's claims for payment about the goods and services being provided, and [fail] to show that such omissions would render those representations misleading half-truths."  Dkt. 84. 23.[2]

---

[2] Defendants also argue that with respect to Defendants being under any obligation to report the alleged fraudulent scheme to the United States Government, "an alleged violation of regulatory reporting requirements is not enough to establish an FCA claim."  Dkt. 84, 23 (citing *United States ex rel. Kasowitz Benson Torres LLP v. BASF Corp.*, 929 F.3d 721, 727–28 (D.C. Cir. 2019); *Mann v. Heckler & Koch Def., Inc.*, 630 F.3d 338, 346 (4th Cir. 2010)).

Plaintiff-Relators respond that an implied false certification is not an express statement but occurs "when [a party] alleges a request for payment under a contract where the contractor withheld information about its noncompliance with material contractual requirements." Dkt. 87, 19 (citing *Triple Canopy*, 857 F.3d at 178 n.3). Plaintiff-Relators then argue that the allegations in the Second Amended Complaint meet that standard. They contend that the planning and execution of the seizure of the Kandahar warehouse, bribes paid to Afghan Government Officials A and B, concealment of Defendants' conduct related to the seizure, and conversations between DLA and Supreme after the seizure wherein Supreme allegedly failed to disclose its part in that conduct, constitute violations of the FAR anti-kickback and business ethics provisions. Dkt. 87, 19-20 (citing 48 C.F.R. §§ 9.104-1, 52.203-7, 52.203-13; 41 U.S.C. § 8702). Plaintiff-Relators next assert that Supreme submitted claims for payment to DLA pursuant to the Second Bridge Contract knowing that it had engaged in the "unlawful and unethical" conduct listed above for no reason other than interfering with "ANHAM's SPV Contract, that was engineered simply to prolong its ability to continue submitting invoices at inflated prices." Dkt. 87, 21. According to Plaintiff-Relators, Supreme certified, with each invoice, that Supreme was in compliance with those provisions even though it clearly was not. Dkt. 87, 21.

In their Reply, Defendants argue that Plaintiff-Relators "misunderstand and misapply" the pertinent anti-kickback laws and regulations and note that Plaintiff-Relators ignore the test set forth in *Escobar*. Dkt. 88, 15.

Plaintiff-Relators fail to satisfy the first prong of the test set forth in *Escobar*. From Plaintiff-Relators' view, Supreme knew that it continued to request payment from DLA even though it engaged in the conduct outlined above, which may have run afoul of the cited statutes. However, Plaintiff-Relators failed to allege in the Second Amended Complaint that Supreme or other defendants made "specific representations" with respect to the "goods or services provided"

24

pursuant to the Second Bridge Contract. *Escobar*, 136 S. Ct. at 2001. Accordingly, these claims fail.

iii. Allegations under Both Theories Lacked Scienter, Materiality, and Causality

Moreover, Defendants contend that Plaintiff-Relators failed to adequately plead the remaining elements of a valid FCA claim given that Plaintiff-Relators have not adequately alleged presentment. Dkt. 84, 23-25.

Plaintiff-Relators respond that such fraudulent conduct and implied certifications were material to DLA's continuing to pay as DLA would typically not continue to pay claims "tainted by . . . fraud or noncompliance." Dkt. 87, 25 (citing *Triple Canopy*, 857 F.3d at 179). Plaintiff-Relators also contend that the fraudulent course of conduct caused DLA to continue paying Supreme as it delayed the termination of the Second Bridge Contract. Dkt. 87, 26. In support, Plaintiff-Relators point to the Director of DLA's statement regarding the importance of a "smooth transition," which Supreme allegedly actively worked against. Dkt. 87, 22. The Director of DLA also revealed that ANHAM failed to provide "any 'smoking gun' regarding seizures or any other alleged untoward behavior," resulting in his rejection of ANHAM's claim that Supreme was engaging in nefarious conduct. Dkt. 87, 22. Defendants' attempts to conceal their conduct further supports that such representations were in fact material because had Defendants revealed what they had done, "DLA would have been precluded by law from paying the claims presented." *Id.*

The Court notes that even if Plaintiff-Relators adequately plead presentment, both sets of claims fail because Plaintiff-Relators did not adequately plead scienter, materiality, and causality.

"The FCA imposes civil liability on any person who 'knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval' to an officer or employee of the United States Government." *United States ex rel. Drakeford v. Tuomey Healthcare Sys., Inc.*, 792 F.3d 364, 380 (4th Cir. 2015) (quoting 31 U.S.C. § 3729(a)(1)(A), (b)(2)(A)(i)). Under the FCA,

25

"the term 'knowingly' means that a person '(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information.'" *Id.* (quoting 31 U.S.C. § 3729(b)(1)) (internal quotation marks omitted). For the same reasons that Plaintiff-Relators failed to plead the existence of an objectively false statement or fraudulent conduct, *supra* p. 23-25, Plaintiff-Relators cannot plausibly allege that Defendants acted with the requisite scienter. Considering that Defendants may have a valid property interest in the Kandahar warehouse and surrounding land, Supreme could not have knowingly submitted a false claim for payment.

With respect to materiality, "[u]nder the FCA, a statement or course of conduct is material if it 'has a natural tendency to influence agency action or is capable of influencing agency action.'" *Wilson*, 525 F.3d at 378 (quoting *United States ex rel. Berge v. Bd. of Trs. of the Univ. of Ala.*, 104 F.3d 1453, 1460 (4th Cir. 1997)).

Regarding whether an implied false certification is material, as an initial matter, such an inquiry is a mixed question of fact and law, and, as such, "is one for the court." *United States ex rel. Bachert v. Triple Canopy, Inc.*, 321 F. Supp. 3d 613, 619 (E.D. Va. 2018) (quoting *Berge*, 104 F.3d at 1460). Additionally, the materiality standard is "demanding" and "a statutory, regulatory, or contractual requirement is 'material' only if it affects 'the likely or actual behavior of the recipient of the alleged misrepresentation.'" *Id.* at 619 (quoting *Escobar*, 136 S. Ct. at 2002).

> [W]hen evaluating materiality under the [FCA], the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive. Likewise, proof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement. Conversely, if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material. Or, if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were

26

violated, and has signaled no change in position, that is strong evidence that the
requirements are not material.

*Escobar*, 136 S. Ct. at 2003-04.

The timing and sequence of events is critical to the analysis of materiality in this case. The

record reflects that the alleged fraudulent scheme and false certifications made were immaterial to

DLA's decisions to execute the Second Bridge Contract and to continue paying Supreme. First,

because claims made pursuant to a fraudulent inducement theory "are concerned with whether 'the

contract or extension of government benefit was obtained *originally* through false statements or

fraudulent conduct,' . . . materiality depends on whether it could have influenced the government's

decision to award [the Second Bridge Contract]." *Wilson*, 525 F.3d at 378 (quoting *Harrison*, 176

F.3d at 787). On June 19, 2012, DLA "extended Supreme's [First B]ridge [C]ontract from

December 13, 2012 through December 12, 2013 ([] "Second Bridge Contract")" in order for

potential bid protests to be adjudicated and in anticipation of other possible delays. Dkt. 81, 10-

11. This occurred prior to discussions involving the seizure of the Kandahar warehouse, prior to

the CEO of MECO and the CE of SAK's execution of the Commercial Lease Agreement and Asset

Purchase Agreement, prior to the seizure of the Kandahar warehouse, and prior to ANHAM

advising DLA of its belief that Supreme engaged in such fraudulent conduct. Accordingly, that

decision was not tainted by any fraudulent conduct. With respect to DLA continuing to pay

Supreme, the second bid protest was denied and the stop work order was lifted on March 27, 2013.

*Id.* at 12.

Additionally, considering the false implied certifications, the Court considers the principle

set forth in *Escobar* that where "the Government pays a particular claim in full despite its actual

knowledge that certain requirements were violated, that is very strong evidence that those

requirements are not material." 136 S. Ct. at 2003. And following *Escobar*, federal appellate

courts across the country have "uniformly recognized that 'continued payment by the federal government after it learns of the alleged fraud substantially increases the burden on the relator in establishing materiality.'" *Bachert*, 321 F. Supp. 3d at 620 (quoting *United States ex rel. Harman v. Trinity Indus. Inc.*, 872 F.3d 645, 663 (5th Cir. 2017)). In this case, ANHAM first advised DLA that ANHAM believed Supreme was involved in the seizure of the Kandahar warehouse and the resulting delay in the commencement of ANHAM's SPV Contract on January 16, 2013. Dkt. 81, 28. ANHAM reiterated this belief on multiple occasions. DLA ultimately responded that it believed both ANHAM and Supreme may have property interests in the Kandahar warehouse and surrounding land. Moreover, because ANHAM was unable to commence with ANHAM's SPV Contract, DLA continued to make payments to Supreme under the Second Bridge Contract.

It follows that causality cannot be established.

Because Plaintiff-Relators failed to plausibly allege scienter, materiality, and causality, the claims under both theories fail.

### iv. Count 9: Conspiracy-Related FCA Claim

Defendants contend that the conspiracy claims must fail because Plaintiff-Relators did not allege that there was a meeting of the minds. Dkt. 84, 25 (citing *Allison Engine*, 553 U.S. at 673; *Ahumada*, 756 F.3d at 282; *United States ex rel. Godfrey v. Kellogg, Brown & Root, Inc.*, No. 1:05-cv-01418, 2008 WL 9878351, at *6 (E.D. Va. Mar. 13, 2008)).

Plaintiff-Relators respond that they set forth sufficient detail in the Second Amended Complaint, noting that SAK and Supreme discussed how to prevent ANHAM from commencing with ANHAM's SPV Contract, that Orenstein, Norgaard, and the CE of SAK agreed that taking possession of the Kandahar warehouse was the way to do that, and that Supreme provided SAK the necessary capital to effectuate the scheme, including paying off Afghan Government Officials. Dkt. 84, 27.

28

Defendants retort that if there was such a conspiracy, the target was ANHAM and not DLA. Dkt. 88, 21.  Thus, these claims fall apart.

To make a viable FCA conspiracy claim, Plaintiff-Relators must allege "(1) the existence of an unlawful agreement between defendants to get a false or fraudulent claim reimbursed by the government and (2) at least one act performed in furtherance of that agreement."  *United States ex rel. DeCesare v. Americare In Home Nursing*, 757 F. Supp. 2d 573, 586 (E.D. Va. 2010) (citing *United States ex rel. Farmer v. City of Houston*, 523 F.3d 333, 343 (5th Cir. 2008)).  Further, "[t]he conspirators must have 'shared a specific intent to defraud the Government.'"  *Id.* (quoting *Farmer*, 523 F.3d at 343)).

As the Court has previously noted, pursuant to the Second Amended Complaint, Defendants may have had a legitimate property interest in the Kandahar warehouse.  Thus, the Court cannot find that the agreement was unlawful.

Accordingly, this claim fails.

### C.  Counts 1-9: Rule 9(b) Standard

Additionally, these claims fail because they do not meet the threshold articulated in Rule 9(b).

Generally, Defendants argue that Plaintiff-Relators "fail to plead with particularity the first element of an FCA claim—a false statement or fraudulent course of conduct," which they contend is fatal to counts one through nine.  Dkt. 84, 17.  More specifically, Defendants argue that the alleged false statements made regarding the second bid protest, Defendant's response to DLA's questions concerning the seizure of the Kandahar warehouse, and statements made in two meetings with DLA, which occurred on May 24, 2013, and September 10, 2013, fail to meet the heightened pleading standard pursuant to Rule 9 as they fail to include the "who, what, where, and how" of

29

the alleged fraudulent scheme. *Id.* at 18-19 (citing *Wilson*, 525 F.3d at 379).  Plaintiff-Relators argue they did so.

First, the Court considers whether Plaintiff-Relators "describe[d] the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.'"  *Hagood*, 2015 WL 1349982, at *7.  As an initial matter, the Amended Complaint makes no specific reference to invoices Supreme made to DLA.  Rather, the allegations center on the surrounding conduct, thereby infecting the claims for payment.  Plaintiff-Relators' allegations hinge upon Supreme allegedly conspiring against ANHAM to delay the commencement of the ANHAM SPV Contract.  Plaintiff-Relators allege that Supreme caused the delay, and thus, was subsequently paid by DLA.  Plaintiff-Relators support the existence of the fraudulent scheme by relaying conversations between various Defendants that Plaintiff-Relator Saderkhail overheard prior to the seizure of the Kandahar warehouse, bid protests initiated by Supreme, the second of which Supreme furnished a letter in support, as well as meetings that Supreme had with DLA.  No "'who, what, when, where and how of the alleged fraud'" was ever alleged. *Hagood*, 2015 WL 1349982 at *7 (quoting *Ahumada*, 756 F.3d at 280).  With regard to what Plaintiff-Relator Saderkhail overheard, Plaintiff-Relators fail to set forth exactly what was said and to whom other than general representations that certain Defendants discussed delaying the commencement of ANHAM's SPV Contract by way of seizing the Kandahar warehouse.  With regard to the letter submitted by Supreme to support the second bid protest, that letter was not attached to the Second Amended Complaint, Dkt. 81.  Further, regarding the meetings that Supreme had with DLA in May and September of 2013, Dkt. 81, 31-33, Plaintiff-Relators were not present and thus provide speculation as to what was said.  Additionally, the agenda and summary communications described in the Second Amended Complaint pertaining to the May 2013 meeting, Dkt. 81, 32, do not provide specific references to

DLA's questions nor Supreme's responses. Thus, these allegations are based on conjecture and fall woefully short of meeting the standard.

Next, the Court considers whether the specific allegations "necessarily le[ad] to the plausible inference that false claims were presented to the [United States G]overnment." *Id.* at 7. As previously found, the Second Amended Complaint does not support a theory of fraudulent inducement. As pleaded, the specific allegations contained in the Amended Complaint do not "necessarily le[ad] to the plausible inference that false claims were presented to the [United States G]overnment.'" *Id.*

Accordingly, Plaintiff-Realtors' allegations also fail because they do not meet the more stringent standard for fraud claims.

### D. Counts 10-12: State Law Claims

Defendants request that the Court dismiss the state law claims for failure to state a claim, or, in the alternative, that the Court decline to exercise supplemental jurisdiction in the event the Court dismisses the FCA claims. Dkt. 84, 26. Plaintiff-Relators argue that the state law claims meet the requisite standards and request permission to brief the supplemental jurisdiction issue. Dkt. 87, 28. In their Reply, Defendants elaborate on the substantive failures of the state law claims. Dkt. 88, 21.

Considering that the FCA claims fail and are dismissed, the Court declines to exercise supplemental jurisdiction over the state law claims. *See, e.g., Nathan*, 2011 WL 3911095, *aff'd* 707 F.3d 451, *cert. denied*, 572 U.S. 1033. For this reason, the Court denies Plaintiff-Relators' request for supplemental briefing on this issue, Dkt. 87, 22 n.5, as that would be futile. *See In re PEC Sols., Inc. Sec. Litig.*, 418 F.3d 379, 391 (4th Cir. 2005) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

### IV. Conclusion

31

The FCA claims fail to meet the 12(b)(6) standard and also fail to meet the 9(b) standard. Thus, those claims are dismissed with prejudice.  Consequently, the Court declines to exercise supplemental jurisdiction over the state law claims.  Accordingly, the Motion is GRANTED.

It is SO ORDERED.

Alexandria, Virginia
July 8, 2020

/s/

Rossie D. Alston, Jr.
United States District Judge

32